1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

9
10
11

| | |
|---|---|
| ROBIN ANDREW DUNN,<br><br>                               Petitioner,<br><br>              vs.<br><br>DAVID B. LONG, Warden,<br><br>                               Respondent. | Civil No.    14cv1557-H (BLM)<br><br>**REPORT AND RECOMMENDATION<br>OF UNITED STATES MAGISTRATE<br>JUDGE RE DENIAL OF PETITION<br>FOR WRIT OF HABEAS CORPUS** |

12
13
14
15
16
17

18      This Report and Recommendation is submitted to United States District Judge Marilyn

19   L. Huff pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

20   District Court for the Southern District of California.

21                                                  **I.**

22                              **FEDERAL PROCEEDINGS**

23      Robin Andrew Dunn (hereinafter "Petitioner"), is a state prisoner proceeding pro se and

24   in forma pauperis with a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF

25   No. 1.)  Petitioner was convicted by a San Diego County Superior Court jury of having sexual

26   intercourse with, and committing a lewd act on, his eight year-old daughter; the jury found that

27   he had substantial sexual contact with her, and personally inflicted great bodily injury on her by

28   infecting her with syphilis.  (Lodgment No. 1, Clerk's Tr. ["CT"] at 283-84.)  The trial judge

found Petitioner had served three prior prison terms, and sentenced him to 28 years-to-life in state prison.  (CT 288-90.)  He alleges in Claim 1 of his federal habeas petition that his federal constitutional rights were violated due to: (a) the denial of a motion for mistrial based on the unavailability of a defense expert witness regarding whether there was penetration sufficient to satisfy the definition of sexual intercourse, (b) the exclusion of evidence of an investigation of the victim's mother by child welfare authorities, (c) the denial of a motion to substitute counsel, and (d) prosecutorial misconduct.  (Pet. at 6.[1])  He alleges in Claim 2 that he received ineffective assistance of trial counsel based on counsel's: (a) failure to subpoena the expert medical witness, (b) animosity toward Petitioner, (c) failure to call witnesses to prove his innocence, (d) failure to adequately investigate and present mental health evidence in support of a diminished capacity defense, (e) conflict of interest, and (f) failure to object to prosecutorial misconduct.  (Id. at 7.)

Respondent has filed an Answer ("Ans.") with a Memorandum of Points and Authorities in support ("Ans. Mem."), and has lodged portions of the state court record.  (ECF Nos. 6-7.)  Respondent contends that habeas relief is not available because the adjudication of Petitioner's claims by the state court on direct appeal is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  (Ans. Mem. at 5-6.)  Respondent contends that to the extent the Petition contains claims which were not adjudicated on direct appeal, but were presented to the state courts in habeas petitions which were denied on procedural grounds, they are procedurally defaulted in this Court.  (Id. at 6-7.)  Petitioner has filed a Traverse.  (ECF No. 8.)

The Court finds that federal habeas relief is not available because the state court adjudication of the claims which were denied on the merits is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts, that any error with respect to the first aspect of Claim 1 is harmless, and that the remaining claims are procedurally defaulted and without merit.  The Court therefore **RECOMMENDS** the Petition be **DENIED**.

---

[1]  When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, such as the Petition, Answer and Traverse, the Court will refer to the pages assigned by that system.

**II.**

**STATE PROCEEDINGS**

In a two-count Amended Information filed in the San Diego County Superior Court on June 8, 2010, Petitioner was charged with sexual intercourse with a child 10 years of age or younger in violation of California Penal Code section 288.7(a) (count one), and committing a lewd act on a child under the age of 14 years of age in violation of Penal Code section 288(a) (count two). (CT 6-7.) The Amended Information included sentence enhancement allegations that Petitioner had substantial sexual contact with the victim within the meaning of Penal Code section 1203.066(a)(8), and personally inflicted great bodily injury on the victim within the meaning of Penal Code section 12022.8. (CT 7.) The Amended Information alleged Petitioner had four prior felony convictions and served three prison terms. (CT 7-8.)

On July 23, 2010, the jury found Petitioner guilty on both counts and found both sentence enhancement allegations true. (CT 283-84.) On July 30, 2010, the trial judge found the prior prison term allegations true, and on September 24, 2010, sentenced Petitioner to 28 years-to-life in state prison. (CT 288-89.)

Petitioner appealed, alleging that his state and federal constitutional rights were violated because the trial court abused its discretion in denying a mistrial motion when a defense medical expert became unavailable, and because he received ineffective assistance of trial counsel due to counsel's failure to subpoena the expert witness. (Lodgment Nos. 5-7.) The appellate court affirmed in a published opinion. People v. Dunn, 205 Cal.App.4th 1086 (2012). Petitioner filed a petition for review in the state supreme court raising the same claims, which was denied with an order that stated: "The petition for review is denied." (Lodgment Nos. 9-10.)

Petitioner filed sequential habeas petitions in the state trial, appellate and supreme courts, presenting additional allegations of unfair trial proceedings and ineffective assistance of counsel. (Lodgment Nos. 11, 13, 15.) The superior and appellate courts denied the petitions on the basis that the claims should have been raised on direct appeal. (Lodgment Nos. 12, 14.) The state supreme court denied the ineffective assistance of counsel claims on the merits, but did not address the remaining claims. (Lodgment No. 16.)

### III.

### TRIAL PROCEEDINGS

Erlene Turley testified that she is the mother of the victim, D., who was born on July 4, 1999, and that Petitioner is D.'s father. (Lodgment No. 3, Reporter's Tr. ["RT"] at 513-14.) In July 2007, just after D. turned eight years old, Turley and D. moved back to San Diego from Atlanta, Georgia. (RT 514.) D. had not seen Petitioner since 2004, when they moved to Atlanta, and she missed her father, so Turley allowed her to live with Petitioner, who was living with his girlfriend Ava Loftis. (RT 515-16.) About two months after D. moved in with Petitioner and Loftis, Turley received a telephone call from Loftis, who put D. on the phone and told her to: "Tell your mom what's been going on." (RT 517.) D. told Turley: "My dad touched me." (Id.) Turley immediately picked up D. and took her to the hospital where she was examined. (RT 518-19.) A few weeks later, Turley noticed that D.'s genital area looked swollen and that she had an unusual discharge in her underwear; Turley gave the underwear to a doctor who diagnosed D. with syphilis. (RT 519-21, 535-36.) Turley said she herself has never been diagnosed with syphilis, that D. had not been diagnosed with syphilis prior to that time, and that Turley and Petitioner had not had sex since shortly after D. was born. (RT 520-24.)

As discussed in detail in Claim 1 below, Turley answered "no" when defense counsel asked her on cross-examination if there was a reason why she moved back to San Diego from Atlanta. (RT 538.) Defense counsel then asked her: "Was there an investigation that took place in Atlanta by the Welfare Department --," at which point the prosecutor interrupted with an objection based on lack of relevance, and that any probative value would be outweighed by the danger of undue prejudice, consumption of time, or misleading of the jury. (Id.) Defense counsel proffered that the Atlanta investigation was prompted by D.'s admission that she had orally copulated her then eleven year-old brother, S., and argued that it was relevant to determine why Turley had moved her family back to San Diego from Atlanta, and relevant to rebut the suggestion that D. was sexually inexperienced. (RT 539-40, 556.) The prosecutor additionally objected on the basis that the defense had not disclosed the existence of the investigation prior to trial, which was not available to the prosecution but was available to Petitioner as D.'s parent.

(RT 539-41.)  Defense counsel proffered a summary of the investigation, the disposition of which was "inconclusive," which stated:

> The family was being investigated by authorities in the state of Georgia. And during this time, [D.] disclosed that she orally copulated [S.] [on or about June 15, 2007].  The family fled the state and was in San Diego County.  The mother contacted the investigating social worker once but did not disclose her whereabouts or follow through with meeting the social worker.

(RT 552-53.)

The prosecutor indicated he had received information that Petitioner had molested D. when she was four years old while she was living with Petitioner and his then-girlfriend Renee, and had decided prior to trial not to introduce that evidence, but indicated that if the defense were to present evidence of sexualization of D., the prosecution would move to enter that evidence.  (RT 570-72.)  The trial judge excluded evidence of the Atlanta investigation based on its lack of relevance, and because its probative value, if any, was overwhelmingly outweighed by the undue consumption of time which would have been required to present witnesses regarding the incident and investigation, and by the possibility of misleading or confusing the jury.  (RT 746-47.)

Jonathan Willis, who was 18 years old when he testified in 2010, testified that he was living with his mother, Ava Loftis, in 2007, in a three-bedroom house/apartment, along with Petitioner, his daughter D., Willis' brothers Cedric and Marquise, and Willis' cousins Harvey, Jahyawey and Harviana.  (RT 600-04, 635.)  Loftis and Petitioner shared the master bedroom; Willis shared a bedroom with his brother Marquise and his cousin Harvey; Jahyawey and Cedric shared the third bedroom; D. and Harviana slept on a couch, or in a bedroom if the occupants were not home, or in the master bedroom with Petitioner on nights when Ava was at work.  (RT 603-06.)  Willis said that one night about midnight he woke Harvey and Jahyawey because Willis heard D.'s voice coming from behind the door of the master bedroom, which he could not open because it was locked, saying:  "Stop.  You're nasty.  I'm not Ava."  (RT 606-20.)

Ava Loftis testified that Petitioner is her ex-boyfriend, and that in August and September of 2007 they lived together at her house along with her sons Cedric, Marquise and Jonathan, her nephews Harvey and Jahyawey, her niece Harviana, and Petitioner's daughter D.  (RT 657-58.)

Ava shared the master bedroom with Petitioner. (RT 659.)  Ava often worked nights, and when she did, D. and Harviana would sleep on the floor of the master bedroom; otherwise the two young girls would sleep in one of the other bedrooms or on a couch in the living room.  (Id.)

Ava testified that in August or September of 2007, D. told her that Petitioner was "feeling on her and humping on her." (RT 661.)  Petitioner had moved out of the house at that point, and Ava was preparing to move out of state, so she called D.'s mother and told her she needed to collect D. because D. did not want to go with Petitioner. (RT 662-63.)  Ava said that at some point after her sexual relationship with Petitioner ended she tested positive for syphilis; she had never been diagnosed with syphilis prior to meeting Petitioner. (RT 663-66.)

Harvey Gardner, who was 16 years old when he testified in 2010, said that Ava Loftis is his aunt, and that in August and September of 2007 he lived with her, Petitioner, his brothers Jonathan and Jahyawey, his sister Harviana, his cousin Cedric, and Petitioner's daughter D. (RT 685-87.)  One night when he was walking past the door of the master bedroom he heard D. say in a very quiet tone, "I'm not Ava." (RT 689-90.)  Harvey testified at the preliminary hearing that he heard D. say on that occasion, "you're nasty" twice, "stop" once, and, "I'm not Ava" four times. (RT 692.)

Jahyawey Gardner, 14 years old when he testified in 2010, said that Ava Loftis is his aunt, and that he was living with her in August and September of 2007, along with his cousins Marquis and Jonathan, his brother Harvey, his sister Harviana, and Petitioner and his daughter D. (RT 708-10.)  Jahyawey said that Jonathan woke him up one night because he heard sounds coming from the master bedroom where Petitioner and Ava slept, and where D. and Harviana would sleep when Ava was at work. (RT 710-11.)  Jahyawey said that he, Harvey and Jonathan went to the door of the master bedroom, which was closed, and heard D. loudly screaming: "Stop.  Get off me.  You're nasty.  I'm not Ava." (RT 712-16.)  Jahyawey said D. told Ava about the incident the next morning. (RT 717-18.)

D. testified that in 2007, just after her eighth birthday, she lived with Petitioner, who is her father, and Ava, her father's girlfriend, at Ava's house, along with Jahyawey, Harvey, Jonathan, and several others. (RT 769-70.)  D. said she usually slept in the living room with

Ava's niece Harviana, and that Petitioner and Ava slept in the master bedroom.  (RT 770-71.) D. testified that one night Petitioner, "humped me," and he touched her "private," which she indicated on a diagram to be the area between a girl's legs, with his "private," which she indicated on a diagram to be the area between a boy's legs.  (RT 772-73.)  D. testified that she and Harviana had fallen asleep on the floor of Petitioner's bedroom after watching a movie, and D. was awoken when Petitioner picked her up and put her on the bed, lying her on her back.  (RT 774-76.)  Petitioner removed her pajama bottoms and her underwear, and got on top of her with his boxer shorts pulled halfway down his legs.  (RT 777-78.)  She said she could feel his private part inside her private part, which hurt, and that she screamed and yelled at him several times that she was not his girlfriend and to get off her, but he responded by telling her to be quiet.  (RT 779-82.)  After he finished, she returned to the floor, but about five minutes later Petitioner picked her up and did the same thing again.  (RT 782-83.)  The next morning she told Ava and Ava's son what happened; Ava called D.'s mother, and D. told her mother what happened.  (RT 783-84.)

Michael Tansey, a San Diego Police Officer, testified that on September 20, 2007, he responded to the emergency room of Grossmont Hospital regarding a report of an eight-year old female who had sex with her father within the last week.  (RT 827-28.)  He interviewed D. when they were alone together in an examination room at the hospital about 10:00 p.m., with D.'s mother and a friend of her mother standing just outside the open door.  (RT 828-30.)  D. said her mother had brought her to the hospital because she had told her mother that, "she had humped her daddy."  (RT 832.)  D. said she was sleeping on the floor of the bedroom shared by Ava and Petitioner, and that she was under a blanket with a 12-year old girl when Petitioner picked D. up, laid her on the bed, and, "rubbed himself on her private parts."  (RT 833.)  Officer Tansey, who had experience interviewing hundreds of children, was surprised D. used the word "humped," as he thought it was beyond the vocabulary of an ordinary eight-year old, and asked her where she learned the word.  (RT 834.)  She said Petitioner had taught her the word, and that it meant that, "two people lie down, one on top of the other, and they don't wear any clothes and they go up and down."  (Id.)  D. said that Petitioner placed her on the bed on her back, pulled

her panties and clothing down to her knees, placed his penis inside her private part, and went up and down. (RT 835-37.) Officer Tansey was surprised that D. used the word penis, and she told him that Petitioner had taught her that word. (RT 835.) She said that she screamed because, "it hurt a lot when daddy did that," and that Petitioner told her to be quiet. (RT 836.) D. told Officer Tansey that Ava's son had asked her why she had been screaming in the bedroom, and that she told him and Ava what happened. (RT 837.)

A videotaped interview with D. by a forensic interviewer at Rady Children's Hospital, conducted on September 26, 2007, was played for the jury, and the record contains both a full transcript and the redacted transcript given to the jury. (RT 844-46, 992; CT 96-135.) D.'s statement during the interview is consistent with her trial testimony and her statement to Officer Tansey. (CT 103-33.) The redacted version shown to the jury did not include D.'s statement that Petitioner had done the same thing once when she was four years old at the house of his girlfriend Renee. (CT 112-15.) Blood collected from Petitioner and D. tested positive for syphilis. (RT 848-86.)

Marilyn Kaufhold, a pediatrician, testified that she examined D. on September 21, 2007. (RT 892-93.) Dr. Kaufhold ordered testing for sexually transmitted diseases because there was a whitish vaginal discharge; D. tested negative for syphilis on September 26, 2007, but tested positive for syphilis on November 13, 2007. (RT 904-10.) Dr. Kaufhold found no signs of trauma or injury to D.'s genital, vaginal or anal area, but said the exam could neither confirm nor negate sexual abuse. (RT 901, 904.) She said that most people who sexually assault children do not try to penetrate into the vaginal canal, and that as few as 13% of children who have been sexually abused exhibit physical symptoms when examined within three days of the abuse. (RT 905, 924-29.) One explanation for that is that a child may consider a penis being inside her when it has just penetrated the vestibule of the external genitalia, but has not entered the vaginal canal as in adult intercourse, which does not leave physical symptoms but can still be painful; in cases where a child has had adult-type intercourse there is often severe injury requiring surgery. (RT 906-08.) Dr. Kaufhold indicated that it would be possible for an adult penis to penetrate the vestibule of an eight-year-old child and not cause any injury, as there is about one

inch available for penetration before reaching the hymen, which blocks the opening to the vaginal canal and can be very painful to the touch.  (RT 907, 920-30.)  She stated that D.: "talked about humping, which implies a movement up and down.  And so, the friction of the up and down movement of his penis against her, um, external genitalia and inside the vestibule can be painful as can the feeling of pressure pushing against her but not completely inside."  (RT 907.)  Dr. Kaufhold concluded that D. had felt a penis inside her vestibule, that is, past the labia majora but short of entering the vaginal canal.  (RT 906-08.)

Jane Marnocha, a medical social worker, testified that she met with D. at the Grossmont Hospital emergency room on the evening of September 20, 2007.  (RT 949.)  Her job is to ascertain whether there is any suspected abuse or neglect of a child and report it to law enforcement and child protective services; she said she does not have an investigative function and does not ask for details.  (RT 950.)  During the interview, D. seemed withdrawn, uncomfortable, embarrassed and lacking emotion, but did not seem to be hiding anything.  (RT 951.)  D. did not want to talk about what happened but agreed to write it down; when asked why she was in the emergency room she wrote, "because he humped me."  (RT 954.)  When asked where her father had touched her with his penis, she wrote, "Inside my pants."  (RT 955.)  Marnocha stopped asking questions at that point because she had enough to refer the matter to the authorities.  (Id.)

Emily Ednacot, a nurse, testified that Petitioner appeared for sick call on December 7, 2007, told her that he had a history of testing positive for syphilis and had been treated for syphilis eight years earlier, and requested to be tested for syphilis.  (RT 962-63.)  Genevieve Minka, a pediatrician, testified that on November 6, 2007, D. came in with her mother requesting a refill of her asthma medication and complaining of a sore spot in her genital area.  (RT 980.)  Dr. Minka found a lesion on D.'s labia majora and swollen lymph nodes in her groin area, and, following a blood test, diagnosed her with syphilis.  (RT 980-87.)  The edge of the lesion, which was about one-half inch across and grew concentrically from the middle out, was visible, but Dr. Minka had to manipulate the labia majora to see its full extent.  (RT 988.)

/ / /

Kenneth Katz, a physician and public health practitioner for the County of San Diego, and an expert in the area of sexually transmitted diseases, especially syphilis, testified that syphilis is transferred by contact between the skin or mucous membrane of an infected person with the skin or mucous membrane of another person, that a lesion forms at the point of contact within 10 to 90 days of exposure, which is the amount of time it takes for the disease to show up in a blood test, and there will often be swelling of the lymph nodes nearest the point of exposure. (RT 1021-26.)  If left untreated, additional lesions will form in other areas of the body, and eventually the disease will attack the brain and nervous system.  (RT 1024-26.)  Dr. Katz said that Petitioner's medical records indicate he was diagnosed with syphilis in 1991, that he was cured of the disease by 1995, and that he became reinfected with the disease sometime between 1995 and 2007; Dr. Katz opined that Petitioner's reinfection was not spontaneous but was caused by exposure to someone with syphilis.  (RT 1031-39.)  Petitioner was again treated for syphilis between 2007 and 2009, at which point he was cured again.  (RT 1040.)  Dr. Katz opined that D. contracted syphilis 10 to 90 days before November 6, 2007, and opined that if Petitioner was the only person with whom D. had sexual contact, it is likely that Petitioner infected her with syphilis.  (RT 1033-34, 1046-47.)  The People rested.

At the beginning of the Tuesday afternoon session, just before Dr. Katz, the final prosecution witness, testified, defense counsel informed the court that he had arranged well in advance to have his expert medical witness, Dr. Lynne Ticson from Los Angeles, appear to testify for the defense that day, but had just been informed that Dr. Ticson's boss would not allow her to appear unless she was subpoenaed and given three days notice.  (RT 997-1001.) Defense counsel said that because the trial had been continued numerous times he had been in regular contact regarding scheduling with Dr. Ticson, a very experienced doctor who had been used as an expert in the past by the public defender's office, and who had agreed to appear without a subpoena.  (RT 997-98, 1074.)  Counsel said he had been attempting to contact her since Friday when it became clear she would be needed to testify on Tuesday, but she had uncharacteristically failed to return messages he left on her cell phone, with the hospital where she worked, and with a private investigator with whom she worked.  (Id.)

The next morning, Wednesday, just before the defense case was set to begin, defense counsel reported to the court that he had finally spoken to Dr. Ticson the previous evening. (RT 1070.)  Counsel said that Dr. Ticson had in the past been a calm, collected professional, but she was emotional and evasive during the call regarding why she had not responded to counsel's numerous attempts to contact her. (RT 1070.)  Dr. Ticson said there was a problem between her and her boss, which defense counsel thought may have been caused by Dr. Ticson, "taking certain liberties and going and doing various things and maybe under the radar," and that her boss may have had a problem with her acting as an expert witness in this case. (RT 1071.)  Dr. Ticson said she had been subpoenaed to appear before a grand jury in Los Angeles in a murder case on Thursday and needed to meet on Wednesday afternoon with the District Attorney to prepare for that appearance, and that she was boarding a flight for a two-week vacation on Thursday night. (RT 1072-73.)  Defense counsel said she had previously told him that she was not going on vacation until the next week. (Id.)  When asked what the general subject of her testimony would be, defense counsel proffered that:

> Basically, your Honor, I think the general subject of her testimony would be essentially the flip side of Dr. Kaufhold.  Whereas Dr. Kaufhold looked at the evidence and believed that not only was it consistent with the history given by the child, um, but she made it sound as if it was very likely, given the medical evidence.  [¶]  Dr. Ticson was the opposite.  She felt that it was unlikely, highly unlikely that there was intercourse.  And "intercourse" meaning penetration, ah, of the area beyond the labia majora into what would be called the mucosa, into that area which I think would correspond to what the law is.

(RT 1001-02.)

Defense counsel indicated that Dr. Ticson would not testify regarding syphilis, other than to provide an opinion regarding Dr. Minka's testimony that she had to manipulate the labia majora in order to see the full extent of the syphilitic lesion. (RT 1080.)  However, defense counsel did not clearly state whether Dr. Ticson would testify that the lesion, which Dr. Katz testified formed at the point of contact, had formed inside or outside the labia majora. (Id.)  The prosecutor replied that he had asked Dr. Kaufhold if she would be available for rebuttal if Dr. Ticson testified, and Dr. Kaufhold had provided him with a 2002 article published in the Child Abuse and Neglect Medical Journal, co-authored by Dr. Ticson, a copy of which is in the record.

(Lodgment No. 2.)  The article concluded that medical, social and legal professionals relied too heavily on medical examinations, that the history taken from the child remained the single most important diagnostic feature, that a biological parent is statistically less likely to commit a penetrating offense because he would lose custody, that only 5.5% of children who reported vaginal or anal penetration had abnormal physical findings, and that the best explanation for the lack of physical findings is the child's unsophisticated understanding of what occurred.[2]  (RT 1090-94; Lodgment No. 2 at 1-15.)

The trial judge determined that substitution of another expert was not possible, and that defense counsel had been responsible and diligent in attempting to secure Dr. Ticson's attendance by accepting her assurance that she did not need to be subpoenaed.  (RT 1006-16, 1073-82.)  Because the court did not have jurisdiction to compel Dr. Ticson's attendance due to the lack of a subpoena, and because a delay to accommodate her schedule would require an unacceptable two-week continuance, the Court declared her to be an unavailable witness.  (Id.)  Defense counsel moved for a mistrial based on Dr. Ticson's unavailability, which counsel contended resulted from the numerous trial continuances.  (RT 1075-80.)  The trial judge denied the motion, finding that although the only area Dr. Ticson's testimony would have touched upon, penetration, was a significant contested issue, and it would have been better to have her testimony, there was no prejudice because, "there certainly is room for -- just on the People's evidence -- there is room for a reasonable doubt as to the penetration element of the crime in Count 1 and the accompanying allegation in Count 2.  So I don't think your client is entirely deprived of pursuing that issue, and there's some -- some, ah, substantial evidence to support that argument on his behalf and raise a reasonable doubt in the mind of the jurors."  (RT 1080-81.)

The defense called a single witness, Raynae Randall, who testified that she had known Petitioner since 2005, that they were boyfriend and girlfriend for about two years until June 2007, and that she had seen Petitioner around children of all ages and saw no indication of

---

[2] Petitioner argued on appeal that the article actually would have tended to validate Dr. Ticson's opinion that: (1) D. was, as with most children, mistaken that penetration occurred; (2) it was statistically unlikely that Petitioner, as her biological father, committed a penetrating offense; (3) Dr. Kaufhold's conclusion that, based on D.'s statement, penetration occurred, was incorrect; and (4) Dr. Minka had misinterpreted her own physical findings.  (Lodgment No. 5 at 16-17.)

inappropriate conduct, although she said Petitioner was never alone with the children.  (RT 1115-16, 1122-23.)  Randall said that Petitioner's daughter D. would often visit when they were living together and play with Randall's children, and Randall never observed, and D. never reported, any inappropriate behavior.  (RT 1118-19.)  The defense rested and there was no rebuttal.  (RT 1129.)

With respect to the penetration issue, the jury was instructed that: "'Sexual intercourse' within the meaning of this law means any penetration, no matter how slight, of the vagina or genitalia by his penis. . . . And 'sexual penetration of the genitalia' refers to penetration of the labia majora, not the vagina itself."  (RT 1174.)  The prosecutor argued to the jury that D. was consistent in her story that Petitioner had placed his penis inside her, which constituted direct evidence of penetration, but even if she was too young or unsophisticated to ascertain whether and to what extent penetration occurred, circumstantial evidence of penetration was provided by the location inside the labia majora of at least a portion of the syphilitic lesion, which the experts testified grew concentrically from the point of contact.  (RT 1193-1210.)  The prosecutor conceded there had been no penetration of the vagina, but argued that there had been penetration of the area beyond the labia majora, satisfying the legal definition of intercourse.  (Id.)  Defense counsel argued to the jury it was improbable that: (1) Petitioner and D. had a long and wonderful father/daughter relationship and then one night out of the blue he molests her; (2) D. said she was screaming but Harviana remained asleep in the room, and only the youngest boy outside the door described her tone as loud, and he had testified at the preliminary hearing he thought he heard laughter; and (3) the type of sexual contact D. described left no physical evidence whatsoever, even though there was only one inch available for penetration before serious injury resulted.  (RT 1227-36.)  Defense counsel also argued that someone other than Petitioner may have infected D., and that the location of the lesion was to the side of and not past the opening of the labia majora.  (RT 1236-40.)

After deliberating about five hours, the jury found Petitioner guilty on count one, sexual intercourse with a child ten years of age or younger, and guilty on count two, committing a lewd act (to wit, touching his penis to the genital area) upon a child under the age of fourteen years;

the jury returned true findings on the allegations that Petitioner had substantial sexual contact with a child under fourteen years of age, and that he personally inflicted great bodily injury upon the victim by infecting her with syphilis.  (CT 279-84.)  A bench trial was held on the prior prison term allegations, which the trial judge found true.  (RT 1296-1303.)  On September 24, 2010, the trial judge sentenced Petitioner to 25 years-to-life on count one, stayed the sentence on count two, and added three consecutive one-year terms, one for each of the three prison priors, for a total sentence of 28 years-to-life.  (RT 1317.)

**IV.**

**PETITIONER'S CLAIMS**

(1)  Petitioner's Fourteenth Amendment rights to due process and a fair trial were violated by: (a) the denial of the mistrial motion based on Dr. Ticson's unavailability; (b) the exclusion of evidence of an investigation by the Atlanta welfare department of D.'s mother just before she moved the family back to San Diego; (c) the denial of a pre-trial motion to substitute counsel; and (d) prosecutorial misconduct.  (Pet. at 6.)

(2)  Petitioner was denied his right to the effective assistance of counsel, as protected by the Sixth and Fourteenth Amendments, by his trial counsel's: (a) failure to subpoena Dr. Ticson; (b) animosity toward Petitioner; (c) failure to preserve witnesses to prove Petitioner's innocence; (d) failure to adequately investigate and present mental health evidence in support of a diminished capacity defense; (e) conflict of interest; and (f) failure to challenge the prosecutorial misconduct.  (Pet. at 7.)

**V.**

**DISCUSSION**

For the following reasons, the Court finds that habeas relief is not available because the adjudication by the state court of those claims which were adjudicated on the merits is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court also finds that any error with respect to the first aspect of Claim 1 is harmless, and that the claims which were not adjudicated on the merits in state court are procedurally defaulted and without merit.

1  **A.     Standard of Review**

2          Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective

3  Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with

4  respect to claims which were adjudicated on their merits in the state court, that in order to obtain

5  federal habeas relief, a petitioner must first demonstrate that the state court adjudication of the

6  claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application

7  of, clearly established Federal law, as determined by the Supreme Court of the United States;

8  or (2) resulted in a decision that was based on an unreasonable determination of the facts in light

9  of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d) (West 2006).

10 Even if the petitioner can satisfy § 2254(d), or show that it does not apply, he still must show a

11 federal constitutional violation occurred.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v.

12 Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).  Petitioner also must demonstrate that

13 any constitutional error is not harmless, unless it is of the type included on the Supreme Court's

14 "short, purposely limited roster of structural errors." Gautt v. Lewis, 489 F.3d 993, 1015 (9th

15 Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing that "most

16 constitutional errors can be harmless.").

17         A state court's decision may be "contrary to" clearly established Supreme Court

18 precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the

19 Court's] cases" or (2) "if the state court confronts a set of facts that are materially

20 indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from

21 [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court

22 decision may involve an "unreasonable application" of clearly established federal law, "if the

23 state court identifies the correct governing legal rule from this Court's cases but unreasonably

24 applies it to the facts of the particular state prisoner's case." Id. at 407.  Relief under the

25 "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that

26 a clearly established rule applies to a given set of facts that there could be no 'fairminded

27 disagreement' on the question." White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07

28 (2014), quoting Harrington v. Richter, 562 U.S. 86, __, 131 S.Ct. 770, 787 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted). Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of time of the relevant state-court decision." Williams, 529 U.S. at 412.  To satisfy § 2254(d)(2), a petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786-87.  The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents."  Id. at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B.    Claim 1**

Petitioner alleges in Claim 1 that his Fourteenth Amendment rights to due process and a fair trial were violated by: (1) the denial of the mistrial based on defense counsel's failure to secure the attendance of an expert witness regarding the critical issue of whether sexual intercourse occurred; (2) exclusion of evidence that D.'s mother was investigated by the Atlanta welfare department just before she moved the family back to San Diego; (3) denial of a pre-trial motion to substitute counsel; and (4) prosecutorial misconduct.  (Pet. at 6.)

Respondent answers that the state appellate court's denial of the first aspect of this claim, on the basis that no federal due process violation arose from the denial of the mistrial motion and

that any error is harmless, is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. (Ans. Mem. at 13-14.)  Respondent contends that the additional aspects of claim one which were raised on state habeas are procedurally defaulted.  (Id. at 10-13; Ans. at 6.)

Petitioner argued in the California Supreme Court in a petition for review, and to the state appellate court on direct appeal, that his federal constitutional rights were violated by the denial of the mistrial motion because without Dr. Ticson's testimony he was unable to present a defense with respect to the material issue of whether sexual intercourse occurred.  (Lodgment Nos. 5, 9.)  The state supreme court summarily denied the petition for review without a statement of reasoning, and the appellate court denied the claim on the merits in a published opinion.  (Lodgment Nos. 8, 10.)  This Court applies the following rebuttable presumption: "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."  Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).  Thus, with respect to the first aspect of Claim 1, the Court will look through the silent denial by the state supreme court to the appellate court opinion, which stated:

> Dunn argues the trial court abused its discretion in denying his motion for mistrial, which, as noted, was based on the unexpected unavailability of his expert witness to testify at trial.  According to Dunn, this deprived him of the opportunity to present evidence on a "critical element in the case, in violation of (his) fair trial and due process rights under the United States and California Constitutions."  After setting forth additional pertinent facts and the applicable standard of review, we shall explain why we reject Dunn's argument.

> 1.  *Additional Facts*

> Near the end of the People's case, Dunn's counsel informed the court he could not reach his retained expert witness, Lynne Ticson, and expressed concern she might not be able to testify because her boss was demanding three days' notice and a subpoena.  Counsel suggested he might request a mistrial based on Ticson's unexpected unavailability to testify.

> The trial court inquired into Ticson's specialty and the general nature of her expected testimony.  Dunn's trial counsel stated that Ticson is a pediatrician who has performed sexual assault examinations for law enforcement.  As to her expected testimony, counsel explained:

> "Basically, Your Honor, I think the general subject of her testimony would be essentially the flip side of Dr. Kaufhold.  Whereas Dr. Kaufhold looked at the evidence and believed that not only was it

consistent with the history given by the child, but she made it sound as if it was very likely, given the medical evidence.  Dr. Ticson was the opposite.  She felt that it was unlikely, highly unlikely that there was intercourse.  And 'intercourse' meaning penetration of the area beyond the labia majora into what would be called the mucosa, into that area which I think would correspond to what the law is."

The court then asked Dunn's counsel whether he had discussed with Ticson the People's request to modify the jury instruction defining sexual intercourse (CALCRIM No. 1127) [FN4] to add: "'Sexual penetration' of the genitalia refers to the penetration of the labia majora, not the vagina."  Counsel answered, "I haven't gotten into that yet because we hadn't any definitive ruling on that."

> FN4: CALCRIM No. 1127 states in pertinent part: "*Sexual intercourse* means any penetration, no matter how slight, of the vagina or genitalia by the penis."

Counsel further explained that he had discussed with Ticson his view that penetration refers to "the interior of the labia majora.  I don't think it's just the labia majora."  According to counsel, the molestation described by Minor—i.e., that Dunn was "on top of her, on more than one occasion, rocking back and forth inside of her to the point that it hurt"—had to involve more than slight penetration of Minor's vulva; it involved "more what seems like intercourse."  Counsel therefore expected Ticson to contradict Kaufhold's testimony that the absence of any significant abnormal findings on physical examination was consistent with the type of molestation claimed by Minor.

The court also discussed with Dunn's counsel the possibility of retaining another expert witness.  Counsel stated he had tried but could not find a substitute.  The court then directed counsel to contact Ticson to secure her presence at trial, but he was unable to do so.

The next day, Dunn's counsel informed the court that Ticson was unavailable to testify at trial due to scheduling conflicts, and formally requested a mistrial.  When the court invited counsel to make a record, counsel reiterated that "the whole penetration issue . . . is essentially what Dr. Ticson's testimony would go to."  According to counsel:

> "(I)t would be her opinion, from her training and experience, that the lack of physical findings would not be consistent with the child's testimony and the facts of the case. . . .  (I)t would be highly unlikely that things could have happened the way it was said that they happened and there not be any physical findings anywhere on her genitalia, be it the . . . inner aspects of the labia, . . . the hymen, and all the various other parts that are involved."

The court also asked Dunn's trial counsel whether he had intended to ask Ticson any questions about Minor's syphilis.  Counsel responded that he was going to ask Ticson to review Minka's notes, which in counsel's view indicated "the chancre was on the outside of the labia.  But other than that, (he) was not going to get into anything about contraction of syphilis in general or how it related to this particular case."  [¶]  The court concluded there would be no miscarriage of justice were Dunn convicted in the absence of Ticson's testimony because Dunn was not prevented from arguing that based on the People's evidence there was a reasonable doubt of his guilt.  The court accordingly denied the motion for mistrial.

2.      *Standard of Review*

A motion for mistrial should be granted "'only when a party's chances of receiving a fair trial have been irreparably damaged.'" (*People v. Clark* (2011) 52 Cal.4th 856, 990 (*Clark*).)  Whether a particular incident is so prejudicial that it warrants a mistrial "requires a nuanced, fact-based analysis," which is best performed by the trial court.  (*People v. Chatman* (2006) 38 Cal.4th 344, 370.)  We review a trial court's order denying a motion for mistrial under the deferential abuse of discretion standard.  (*Clark*, at p. 990.)  "Under this standard, a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Guerra* (2006) 37 Cal.4th 1067, 1113.)

3.      *Legal Analysis*

Although the parties agree the ultimate inquiry on a motion for mistrial is, as noted above, whether some event occurred that irreparably damaged the moving party's chance of receiving a fair trial, the parties have not cited, and we have not found, any California cases discussing whether a mistrial should be granted when an expert witness retained by the moving party (or any other witness expected to testify on behalf of the moving party) unexpectedly becomes unavailable or otherwise does not appear at trial.  [FN5]  We have, however, found cases discussing the analogous situation of a motion for new trial based on the absence of testimony from a witness who was expected to testify at trial.  Like a motion for mistrial, a motion for new trial should be granted when necessary "to insure an accused a fair trial." (*People v. Davis* (1973) 31 Cal.App.3d 106, 110 (*Davis*).)

FN5:  The lack of such case law is not surprising because in a typical motion for mistrial, a criminal defendant contends *an adverse or third party* (e.g., the trial judge, the prosecutor, a prosecution witness or a juror) said or did something that prevented the defendant from receiving a fair trial. (See, e.g., *People v. Thomas* (2012) 53 Cal.4th 771, 818 (jurors discussed death of witness's wife during deliberations); *People v. Dement* (2011) 53 Cal.4th 1, 49 (alleged prosecutorial misconduct); *People v. Cowan* (2010) 50 Cal.4th 401, 459 (substitution of judge during course of trial); *People v. Sanders* (2010) 189 Cal.App.4th 543, 552–553 (prosecution witness refused to answer questions on recross-examination).)  A defendant ordinarily may not obtain a mistrial based on his own conduct or conduct for which he is responsible. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1030 (*Lewis & Oliver*); *People v. Hines* (1997) 15 Cal.4th 997, 1053–1054.)  A defendant, of course, is responsible for identifying, locating and, if necessary, serving subpoenas on witnesses he intends to call to testify on his behalf at trial.  (See *Taylor v. Illinois* (1988) 484 U.S. 400, 415–416.)

In determining whether to grant a motion for new trial based on the absence of a witness who was expected to testify at trial, relevant factors include: (1) the defendant's diligence in securing the attendance of the witness (*People v. Beard* (1956) 46 Cal.2d 278, 282 (*Beard*); *People v. DePrima* (1959) 172 Cal.App.2d 109, 116; *People v. Goodale* (1939) 33 Cal.App.2d 80, 87 (*Goodale*)); (2) the defendant's use of available alternative means to obtain the desired evidence (*Beard*, at p. 282; *People v. Glover* (1969) 270 Cal.App.2d 255, 260 (*Glover*)); (3)

the defendant's fault for the witness's nonappearance (*People v. Randle* (1982) 130 Cal.App.3d 286, 296 (*Randle*); *Davis*, *supra*, 31 Cal.App.3d at p. 110; cf. *Lewis & Oliver*, *supra*, 39 Cal.4th at p. 1030 (defendant may not disrupt courtroom proceedings and then urge disruption as ground for mistrial because "'defendant is not permitted to profit from his own misconduct'")); and (4) the nature of the testimony expected from the witness and its probable effect on the outcome of the trial (*Davis*, at pp. 109, 111; *DePrima*, at p. 116). Applying these factors, we conclude the trial court did not abuse its discretion in denying Dunn's motion for mistrial.

First, it is not clear whether Dunn exercised due diligence in securing Ticson's attendance at trial. The record indicates counsel never met Ticson in person, had difficulty communicating with her by telephone, and never obtained a firm commitment from her that she would attend the trial on a specific date even though counsel knew she was scheduled to leave on vacation near the time of trial. Further, Dunn's failure to subpoena Ticson to appear at trial would support the trial court's decision to deny the mistrial motion. (See *Beard*, *supra*, 46 Cal.2d at p. 282 (trial court properly denied new trial motion when defendant did not exercise due diligence by serving known witness with subpoena); *Goodale*, *supra*, 33 Cal.App.2d at pp. 87–88 (same).) On the other hand, as the People concede, it is not customary for a party to subpoena his own retained expert witness, and the record indicates Ticson's boss demanded service of a subpoena and three days' advance notice for the first time during trial. The record also indicates Dunn's counsel made several efforts to contact Ticson by telephone to arrange for her appearance at trial, but was "getting the runaround." Although on this record we have some doubt about Dunn's due diligence in securing Ticson's appearance at trial, we will defer to the trial court's finding, uncontested by the People, that Dunn's counsel was "diligent and acted very reasonably in trying to have this witness available on behalf of (his) client." This factor therefore would support granting Dunn's motion for mistrial (see *Davis*, *supra*, 31 Cal.App.3d at pp. 108–111 (trial court has discretion to grant new trial when defendant takes reasonable steps to secure attendance of material witness at trial but witness does not appear)); but because the issue is so close, we do not attribute much weight to it.

Second, Dunn did not use available alternative means to obtain testimony from Ticson. He did not request a continuance of the trial, present a declaration from or offer to depose Ticson, or seek a stipulation from the People as to Ticson's credentials or the substance of her expected testimony that could be read to the jury. The failure at least to explore these options supports the denial of Dunn's motion for mistrial. (See *Glover*, *supra*, 270 Cal.App.2d at p. 260 (new trial motion properly denied when defendant did not seek continuance to procure desired witnesses).)

Third, Dunn was not entirely free from fault with respect to Ticson's sudden and unanticipated inability to testify at trial. As already noted, Dunn's counsel knew before trial commenced that Ticson was scheduled to leave for vacation near the time of trial. He therefore should have communicated more effectively with her and made more definitive arrangements to secure her appearance at trial. Although ordinarily that would not include service of a subpoena on Ticson because she was a retained expert witness, the combination of counsel's inability to contact her during trial and her potential unavailability suggested the need for a subpoena. In addition, nothing in the record suggests the People bore any responsibility for Ticson's failure to appear at trial. Thus, because Dunn was at least partially responsible for Ticson's nonappearance but the People bore no such responsibility, this factor supports the denial of his

mistrial motion. (See *Randle, supra*, 130 Cal.App.3d at pp. 292, 296 (motion for new trial properly denied when defendant was at fault for counsel's not communicating with or subpoenaing material witness); see also *Lewis & Oliver, supra*, 39 Cal.4th at p. 1030 (defendant not entitled to mistrial based on courtroom commotion he caused).)

Fourth, and most importantly, Ticson's expected testimony would not have changed the result of the trial. As we interpret Dunn's counsel's offer of proof, Ticson would have testified, contrary to Kaufhold, that the absence of abnormal findings on Minor's genital examination when Mother first took Minor to the hospital was inconsistent with the incident of molestation Minor described. Although Dunn contends Ticson's expected testimony concerned "the critical element of penetration," which he describes as "a 'significant contested issue in the case,'" Dunn has never clearly articulated his precise position regarding penetration, or how it conflicted with the People's position. At some times, Dunn's position seems to have been that the law required vaginal penetration for conviction. [FN6] At other times, his position seems to have been that Minor's claim that Dunn was "inside" her, which he interprets as vaginal penetration, must have been fabricated, because such penetration would have caused observable injury to her genitals. [FN7] On either theory, the testimony expected from Ticson would not have resulted in a different outcome at trial.

FN6: Several statements by Dunn's counsel suggest this was the defense theory. When Dunn's counsel advised the trial court he might have to request a mistrial, he represented that Ticson "felt that it was unlikely, highly unlikely that there was intercourse. *And 'intercourse' meaning penetration of the area beyond the labia majora into what would be called the mucosa, into that area which I think would correspond to what the law is.*" (Italics added.) He further stated that, in his view, penetration refers to "the interior of the labia majora. I don't think it's just the labia majora." Also, during closing arguments to the jury, Dunn's counsel argued that "contact with the labia majora is not enough. It has to penetrate the labia majora. In other words, *past the labia majora. Has to be internal.*" (Italics added.) Finally, in reminding the jury about the reasonable doubt standard, counsel argued: "It really does exist that it's beyond a reasonable doubt that there was actually penetration of the penis *past the labia majora. That it got past, got to the interior.*" (Italics added.)

FN7: Other statements of Dunn's trial counsel are consistent with this interpretation of the defense theory. Counsel argued the molestation described by Minor—i.e., that Dunn was "on top of her, on more than one occasion, rocking back and forth inside of her to the point that it hurt"—had to involve more than slight penetration of Minor's vulva; it involved "more what seems like intercourse." He also represented, as part of his offer of proof, that Ticson would have testified that "it would be highly unlikely that things could have happened the way it was said that they happened and there not be any physical findings anywhere on (Minor's) genitalia."

If Dunn was proceeding on the theory that penetration of Minor's vagina was required for conviction, he was wrong on the law. The conviction on count 1 required proof that Dunn had "sexual intercourse" with Minor (§ 288.7, subd. (a)), which required penetration of her labia majora, not her vagina. (*People v. Quintana* (2001) 89 Cal.App.4th 1362, 1364; *People v. Karsai* (1982) 131

Cal.App.3d 224, 232, disapproved on other grounds by *People v. Jones* (1988) 46 Cal.3d 585, 600, fn. 8.)  The offense charged in count 2 (lewd act on minor, § 288, subd. (a)) "was committed when (Dunn) placed his . . . exposed penis on (Minor's vulva), thereby touching her body with the specific intent to arouse, appeal to, or gratify his or her sexual desires.  Penetration is irrelevant for this charge. . . ." (*In re Asencio* (2008) 166 Cal.App.4th 1195, 1206.)  [FN8]  The trial court correctly instructed the jury on these legal principles, including the modification requested by the People that labial penetration was sufficient for conviction on count 1 (see CALCRIM Nos. 1110, 1127), and the jury was bound to follow these instructions (§ 1126; *In re Stankewitz* (1985) 40 Cal.3d 391, 399).  Nothing in Ticson's expected testimony could have had any impact on the controlling law the jury had to apply.  (See, e.g., *Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1635 (expert witness may not give opinion on question of law).)

> FN8: Dunn contends Ticson's expected testimony also pertained to "the allegation of penetration as significant (*sic*) sexual conduct in count 2."  There was no such allegation, however.  During closing arguments, the prosecutor conceded "(t)here's no evidence here and no one's saying that Mr. Dunn penetrated (Minor's) anatomical vagina."  Instead, the prosecutor argued the substantial sexual conduct required to prove the probation-denial allegation attached to count 2 consisted of masturbation.  Masturbation encompasses any touching or contact, however slight, of the genitals of the victim or the offender done with the intent to arouse the sexual desires of the victim or the offender. (*People v. Terry* (2005) 127 Cal.App.4th 750, 771–772; *People v. Chambless* (1999) 74 Cal.App.4th 773, 783.)  Minor's testimony that Dunn touched his "private part" to hers clearly established masturbation, which was sufficient to satisfy the "substantial sexual conduct" required to deny probation for the conviction under section 288. (§1203.066, subds. (a)(8), (b).)

If instead Dunn was proceeding on the theory that Minor was claiming Dunn had inserted his penis into her vagina, Ticson's expected testimony that such insertion was inconsistent with the lack of any observable injury to Minor's genitalia would have added nothing of value at trial.  As noted earlier, the People's expert witness, Kaufhold, had already testified she found no injuries when she examined Minor's genitalia, but she would have expected to see "serious tears" requiring surgical repair if Dunn had actually inserted his penis into Minor's vagina.  Moreover, during closing arguments the prosecutor argued: "There's no evidence here and no one's saying that Mr. Dunn penetrated (Minor's) anatomical vagina. . . .  (But) if his penis is rubbing up and down and it broke the barrier of her labia majora, that's penetration."  Thus, because Ticson's expected testimony concerning penetration would not have contradicted Kaufhold's testimony or negated the People's legally sufficient theory of the case, Ticson's testimony would not have affected the result of the trial, a factor further supporting the trial court's denial of Dunn's mistrial motion.  (See *People v. Ochoa* (1998) 19 Cal.4th 353, 473 (no abuse of discretion in denying new trial motion based on new testimony when defendant failed to show different result was probable on retrial); *Goodale, supra*, 33 Cal.App.2d at pp. 88–89 ("An appellate court is not permitted to grant a new trial to allow a defendant to introduce evidence that is cumulative.").)  [FN9]

> FN9: In light of our conclusion that Ticson's expected testimony would not have affected the outcome of the trial, we need not and do not address the parties' arguments concerning the impeachment value of an article Ticson coauthored, in which it was reported that

many child victims of sexual abuse who alleged vaginal penetration had normal physical examinations and that the victims had misinterpreted labial penetration as vaginal penetration.

Dunn argues, however, that "the 'battle of the experts' and the reasonable inferences therefrom created the realistic possibility" of a better outcome for him at trial. He bases this argument on the assertion that Ticson's "opinion regarding the question of penetration and the location of the (chancre) and whether it evidenced a penetrating injury" differed from Kaufhold's. We are not persuaded.

As noted, Kaufhold testified that Minor's description of the molestation and the absence of any injury to her genitalia observable on physical examination were consistent with Dunn's penis having penetrated Minor's labia, but not her vagina. Trial counsel represented that Ticson would also testify that the finding of no genital injury on physical examination was inconsistent with vaginal penetration, but conceded he had not discussed with her the possibility of labial penetration. And, contrary to Dunn's assertion on appeal, his trial counsel never proffered an opinion from Ticson regarding the significance of the location of the chancre. Counsel simply advised the trial court of his intention to ask Ticson to review the diagram of the chancre in Minka's notes, which counsel interpreted as showing "the chancre was on the outside of the labia."

Thus, Dunn's contention that Ticson's "expected testimony provided weight and significance to an argument that the touching of (Minor) was inadvertent, was associated with bathing, showering and/or cleaning the child, or, alternatively, that it was an impermissible touching that did not constitute penetration," has no factual foundation. Because a "defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference" (*People v. Mincey* (1992) 2 Cal.4th 408, 442 (*Mincey*)), we reject Dunn's claim that his "due process rights became a hollow guarantee without Ticson's expected opinion testimony." [FN10]

> FN10: Dunn also had no due process right to present Ticson's expected testimony because, as noted, that testimony was duplicative of Kaufhold's and unresponsive to the People's theory of guilt. (See, e.g., *Mincey, supra*, 2 Cal.4th at p. 440 (defendant has no due process right to present evidence cumulative of prosecution evidence); *People v. Babbitt* (1988) 45 Cal.3d 660, 685 (exclusion of irrelevant evidence "did not implicate any due process concerns"); *People v. Goodwillie* (2007) 147 Cal.App.4th 695, 725 (no due process violation in exclusion of defense expert testimony that did not have "significant probative value").)

In sum, all of the factors enumerated above (see pp. 200–01, *ante*), except the due diligence factor to which we attribute little weight (see pp. 201–02, *ante*), support the trial court's denial of Dunn's motion for mistrial. We therefore conclude the absence of Ticson's testimony did not irreparably damage Dunn's chances of receiving a fair trial, and the court did not abuse its discretion in denying the motion. (*Clark, supra*, 52 Cal.4th at p. 990.)

In any event, even if we were to assume the trial court erred in denying Dunn's motion for mistrial based on Ticson's unanticipated unavailability to testify, we would conclude any such error was harmless. The evidence of Dunn's guilt, "though (partially) circumstantial, was tight and strong." (*People v. Stinson* (1963) 214 Cal.App.2d 476, 482 (*Stinson*).) Minor testified Dunn rubbed his penis against her vulva, and her account of the molestation, as related by several

witnesses, was consistent. Others living at the apartment with Dunn and Minor corroborated the molestation by testifying they heard Minor tell Dunn to get off her because she was not his girlfriend. Minor's development of a syphilitic chancre on the inner aspect of her right labium majus and Dunn's positive blood test for syphilis further incriminated Dunn. Against this evidence, Dunn offered only a single character witness, a former girlfriend who testified he never acted inappropriately toward her children, nieces and nephews, but conceded adults were always present whenever he was around the children. "Dropping (this testimony) on the scale causes no perceptible gravitation." (*Stinson*, at p. 482.)

On this record, whether we apply the federal standard requiring reversal unless the error was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), or the California standard requiring reversal only if it is reasonably probable the defendant would have obtained a better outcome in the absence of the error (*People v. Watson* (1956) 46 Cal.2d 818, 836), we are confident Dunn would not have obtained a more favorable result had Ticson testified as his counsel represented she would. Accordingly, reversal of the order denying Dunn's motion for mistrial (and of the judgment) is not required. (See, e.g., *People v. Harris* (1994) 22 Cal.App.4th 1575, 1581 (any error in denying mistrial motion harmless when "(e)vidence of (defendant's) guilt was overwhelming and undisputed at trial"); *Stinson, supra*, 214 Cal.App.2d at p. 482 (same when evidence "points convincingly to guilt").)

*Dunn*, 205 Cal.App.4th at 1092-1100.

Clearly established federal law provides that Petitioner has a right to "a meaningful opportunity to present a complete defense." California v. Trombetta, 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness."); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.") The Supreme Court has stated that:

The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19 (1967); Crane v. Kentucky, 476 U.S. 683, 690 (1986) (holding that the opportunity to be heard, which is an essential component of procedural fairness, "would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim

of innocence."); but see Holmes v. South Carolina, 547 U.S. 319, 324 (2006) ("[W]e have stated that the Constitution permits judges to exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, (or) confusion of the issues.") (internal quotation marks omitted); see also People v. Ayala, 23 Cal.4th 225, 282 (2000) ("A motion for mistrial should be granted only when a party's chances of receiving a fair trial have been irreparably damaged.") (internal quotation marks omitted).

The Ninth Circuit has indicated, post-AEDPA, that:

> In a habeas proceeding, we have traditionally applied a balancing test to determine whether the exclusion of evidence in the trial court violated petitioner's due process rights, weighing the importance of the evidence against the state's interest in exclusion. In balancing these interests, we must, on the one hand, afford "due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable . . . evidence." On the other hand, we must stand vigilant guard over the principle that "(t)he right to present a defense is fundamental" in our system of constitutional jurisprudence. In light of these competing interests, federal habeas courts must "determine what weight the various interests will carry when placed on the scales," and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.

Chia v. Cambra, 360 F.3d 997, 1003-04 (9th Cir. 2004) (citations omitted).

A review of the record reveals that the state appellate court correctly found that Dr. Ticson and Dr. Kaufhold agreed on several issues. They agreed that most men who sexually abuse children do not attempt to penetrate the vaginal canal, and that the lack of sophistication of young girls is a primary factor in explaining why only a small percentage of girls who report penetration have abnormal physical findings. They also agreed that penetration short of entering the vaginal canal is painful but will not cause physical injury in the vast majority of cases. Their disagreement would go to the ultimate issue of whether Petitioner's penis penetrated beyond the victim's labia majora, a necessary finding to convict on the sexual intercourse count. Dr. Kaufhold testified that there was at least one inch available for penetration beyond the labia majora before encountering the hymen blocking entry into the vaginal canal, and that entry into that area can be painful, particularly touching the hymen. She concluded that penetration into that area occurred because D. consistently reported she felt Petitioner's penis enter her private part, and that it was painful. Dr. Kaufheld's conclusion is supported by the fact that D. gave

consistent accounts to the doctors, police, social workers and at trial that it hurt when she felt Petitioner "inside" her.  Her account was corroborated by her contraction of syphilis, and by the testimony of the three boys outside the bedroom door who all heard her say:  "Stop.  You're nasty.  I'm not Ava."

Although Dr. Kaufhold's conclusion was based primarily on D.'s consistent, corroborated account, which Dr. Ticson in her article agreed was usually the best evidence of what happened, additional expert testimony provided strong evidence that Petitioner's penis penetrated past the labia majora.  Dr. Minka testified that she could see a small part of the syphilitic lesion when she first looked at D.'s genitalia, but had to manipulate the labia majora to see its full extent, and that such lesions grow concentrically.  Dr. Katz testified that such lesions form at the point of contact with the skin of a person infected with syphilis, and that county health records showed that Petitioner was infected with syphilis.

It is unlikely that Dr. Ticson's opinion that the lesion did not form inside the labia majora, provided she would have given such an opinion, would have carried much weight with the jury, in that it would have been based on Dr. Ticson's review of Dr. Minka's report of her physical examination of the victim, during which Dr. Minka observed that part of the lesion was inside the labia majora.  Any opinion formed by Dr. Ticson regarding the location of the lesion based on her review of Dr. Minka's report would not have carried as much weight with the jury as the testimony of the examining doctor.  In any case, Dr. Minka did not testify, one way or the other, whether the center of the lesion was located inside the labia majora.  As the trial court observed, defense counsel was fully able to, and did (see RT 1227-49), argue that Dr. Minka's testimony did not establish that the lesion had formed past the opening of the labia majora, that the lack of physical findings by Dr. Kaufhold was consistent with a lack of penetration, and that Dr. Kaufhold's conclusion was based entirely on an implausible account given by D., who may have contracted syphilis from someone other than Petitioner.  Even assuming Dr. Ticson would have testified that in her opinion the lesion formed outside the labia majora, and that the lack of physical findings tended to show a lack of penetration, in light of the areas of agreement between Dr. Ticson and Dr. Kaufhold, in light of the victim's consistent and corroborated account that

it hurt when she felt Petitioner "inside" her, and in light of the fact that Dr. Minka actually examined D. but did not testify that the lesion had originated inside the labia majora, the Court finds that the failure of Dr. Ticson to testify does not weigh heavily in evaluating whether Petitioner was denied his constitutional right to present a complete defense.  See Chia, 360 F.3d at 1004 (indicating that the factors to consider are: "(1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense.")

On the other side of the scale is, "the substantial state interest in preserving orderly trials [and] in judicial efficiency." Id. at 1003.  Here, the trial had already been continued numerous times prior to jury selection and was taking longer than expected, and a two-week continuance would have been required in order to have Dr. Ticson appear.  Petitioner was arraigned on October 16, 2007, the original Information was filed on October 24, 2007, and the preliminary hearing was set for October 29, 2007, but was continued numerous times and finally held nearly a year later on October 15, 2008.  (CT 1, 206-32.)  The trial was scheduled to begin on February 9, 2009, but was also continued numerous times, and did not begin until Monday, July 12, 2010, a delay of nearly one and one-half years on top of the one-year delay of the preliminary hearing. (CT 232-53.)  The trial judge told the prospective jurors that the case was expected to last from four to six days, including jury selection, presentation of evidence, and deliberation.  (RT 344-45.)  The prosecution rested on July 20, and it was on Wednesday, July 21, ten days after trial began, that it became clear that Dr. Ticson would not be available for an additional two weeks. On Thursday, July 22, after closing argument and instruction, and just before deliberations began, two seated jurors switched places with two alternate jurors as a compromise to avoid excusing the two seated jurors.  The two seated jurors had indicated on voir dire that they had pre-paid tickets to attend the Comic-Con convention in San Diego beginning on Thursday, and the trial judge had assured them they would be deliberating by Tuesday. (RT 1213-19, 1269-70.) Another juror complained that her employer was upset that the trial was taking longer than anticipated, and the trial judge indicated that the jurors are, "getting a little impatient, I suppose."

(RT 1220.)  Thus, the preliminary hearing was continued for a year, the trial was continued for an additional one and one-half years, and the trial was taking nearly twice as long as anticipated. A two-week continuance to accommodate Dr. Ticson would have resulted in a substantial inconvenience to the jurors, the attorneys and the court.  Thus, "the substantial state interest in preserving orderly trials [and] in judicial efficiency" weighs heavily in this case.  Chia, 360 F.3d at 1003-04.

Lightening that weight somewhat, perhaps, is the appellate court's finding that defense counsel did not use all available alternative means to obtain testimony from Dr. Ticson, such as requesting a continuance, obtaining a declaration or deposition, or seeking a stipulation as to her testimony, and that defense counsel could have anticipated the need to subpoena her based on her lack of communication and upcoming vacation unavailability.  Nevertheless, in light of the cumulative nature of Dr. Ticson's anticipated testimony, the weaknesses in the non-cumulative aspects of her anticipated testimony, and in particular defense counsel's ability to argue based on the evidence presented that there was no penetration, those findings do not undermine the substantial interests of judicial efficiency so as to tip the balance in favor of finding a due process violation.  Moreover, it was objectively reasonable for the appellate court to find that defense counsel had acted reasonably in accepting Dr. Ticson's assurance that she would appear without a subpoena, and that the prosecution bore no responsibility for her failure to appear.

Accordingly, consistent with the objectively reasonable finding by the appellate court that "the absence of Ticson's testimony did not irreparably damage Dunn's chances of receiving a fair trial," this Court assigns less weight to her failure to testify than to the "substantial" interest of the trial court to judicial efficiency and preservation of an orderly trial.  Chia, 360 F.3d at 1003-04 (holding that a federal habeas court must "determine what weight the various interest will carry when placed on the scales," and ultimately determine whether the decision of the state court to exclude the evidence in question was reasonable or unreasonable.)  The Court finds that Petitioner is not entitled to habeas relief with respect to the first aspect of Claim 1 because he has failed to satisfy the provisions of 28 U.S.C. § 2254(d), as it is clear that the state court adjudication is neither contrary to, nor involves an unreasonable application of, clearly

established federal law which provides that a defendant has a federal constitutional right to present a complete defense, and is not based on an unreasonable determination of the facts. Holmes, 547 U.S. at 324; Williams, 529 U.S. at 405-06; Trombetta, 467 U.S. at 485; Chambers, 410 U.S. at 294; Washington, 388 U.S. at 19; Crane, 476 U.S. at 690; Chia, 360 F.3d at 1003-04.

Alternatively, assuming Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d), it is clear that any error in denying the mistrial motion was harmless.  The state court here found that any error resulting from the denial of the mistrial motion was harmless beyond a reasonable doubt because the evidence against Petitioner was tight, strong and well-corroborated, and because he would not have obtained a more favorable result had Dr. Ticson testified in the manner proffered by defense counsel.  The Supreme Court has indicated that when a federal habeas court is reviewing such a determination, it is required to determine whether the assumed error was harmless under the standard of Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), even if Petitioner could satisfy the provisions of 28 U.S.C. § 2254(d).  Fry, 551 U.S. at 119-22; see Pulido v. Chrones, 629 F.3d 1007, 1012 (9th Cir. 2010) (holding that a federal habeas court "need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review . . . was contrary to or involved an unreasonable application of clearly established  federal law . . . because the Brecht test 'obviously subsumes' the more liberal" AEDPA standard), quoting Fry, 551 U.S. at 119-20.  Thus, even assuming Petitioner could satisfy the provisions of § 2254(d), he is not entitled to federal habeas relief unless he can show that the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

As set forth above, Dr. Ticson would have testified consistently with Dr. Kaufhold that physical injuries are very seldom observed in children who report penetration, mostly due to their lack of sexual sophistication, and the history taken by the child remains the most accurate way to determine whether penetration, short of penetration into the vaginal canal, occurred. Although defense counsel indicated that Dr. Ticson was prepared to testify that Dr. Kaufhold was mistaken in concluding, based on D.'s account, that penetration occurred, defense counsel did not explain how Dr. Ticson would deal with D.'s consistent, corroborated description of the

event as having hurt when she felt Petitioner "inside" her, other than to merely disagree with Dr. Kaufhold's conclusion based on the same evidence.  As the appellate court correctly found, to the extent Dr. Ticson would opine that D.'s account was not consistent with penetration into the vaginal canal, it would add nothing to the defense because the prosecution conceded there was no such penetration.  Petitioner has also not indicated why Dr. Ticson would deviate from the prevailing expert opinion, which she endorsed in her article, that a child's account is the most reliable evidence of what occurred where there are no physical findings, or why D.'s account does not provide reliable evidence of penetration short of the vaginal canal.  Even if she could provide a reasonable alternative to Dr. Kaufhold's opinion, there is also no indication that Dr. Ticson could have challenged Dr. Minka's testimony that she had to manipulate the labia majora to see the full extent of the syphilitic lesion, which the experts testified grows concentrically from the point of contact.  In other words, Dr. Ticson's testimony would have added little to defense counsel's argument to the jury that the scientific basis of Dr. Kaufhold's conclusion regarding penetration was in actual fact merely an acceptance of an implausible account by D., and that Dr. Minka's examination did not prove that the point of contact, if any, between Petitioner's penis and D.'s genitalia occurred inside the labia majora.

Thus, Petitioner has not shown that Dr. Ticson's testimony would have substantially undermined the direct evidence of penetration provided by D.'s consistent and corroborated statement that it hurt when she felt Petitioner's private part inside her private part, would have substantially challenged Dr. Kaufhold's conclusion that D.'s account was consistent with penetration of the labia majora without penetration into the vaginal canal, or would have substantially assisted his argument to the jury that Dr. Minka's testimony did not provide evidence of penetration.  Accordingly, Petitioner has not shown that the alleged error in failing to grant a mistrial based on Dr. Ticson's unavailability had a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S. at 637.

Petitioner alleges in the second aspect of Claim 1 that the trial court erred in sustaining an objection to defense counsel's question on cross-examination of Erlene Turley, D.'s mother, regarding an investigation by the Atlanta Welfare Department.  (Pet. at 6; Traverse at 2-4.)  After

Turley answered "no" when defense counsel asked her on cross-examination if there was a reason why she moved back to San Diego from Atlanta, defense counsel immediately asked her: "Was there an investigation that took place in Atlanta by the Welfare Department --," at which point the prosecutor interrupted with an objection based on lack of relevance, and that any probative value would be outweighed by the danger of undue prejudice, consumption of time or misleading of the jury.  (RT 538.)  Defense counsel proffered that the Atlanta investigation was prompted by D.'s admission that she had orally copulated her then eleven year-old brother, S., and argued that it was relevant to determine why Turley had moved her family back to San Diego from Atlanta, and relevant to rebut the suggestion that D. was sexually inexperienced. (RT 539-40, 556.)  The prosecutor additionally objected on the basis that the defense had not disclosed the existence of the investigation prior to trial, information which was not available to the prosecution but was available to Petitioner as D.'s parent.  (RT 539-41.)  Defense counsel proffered a social worker's summary of the investigation, which indicated the disposition was "inconclusive," and which stated:

> The family was being investigated by authorities in the state of Georgia. And during this time, [D.] disclosed that she orally copulated [S.] [on or about June 15, 2007].  The family fled the state and was in San Diego County.  The mother contacted the investigating social worker once but did not disclose her whereabouts or follow through with meeting the social worker.

(RT 552-53.)

The prosecutor maintained that because the Atlanta investigation was inconclusive there was no basis to believe the allegations were true, and said he had received information that Petitioner had molested D. when she was four years old and living with Petitioner and his then-girlfriend, and had decided not to introduce that evidence, but indicated that if the defense were to present evidence of sexualization of D., the prosecution would move to enter that evidence as well.  (RT 563-64, 570-72.)  The trial judge excluded evidence of the investigation based on its lack of relevance and because its probative value, if any, was overwhelmingly outweighed by the undue consumption of time required by presenting witnesses regarding the incident and investigation, and by the possibility of misleading or confusing the jury.  (RT 746-47.)  D.'s recorded interview, which was shown to the jury, was redacted to exclude her statement that

1  Petitioner had done the same thing once when she was four years old at the house of his then-

2  girlfriend Renee.  (CT 112-15.)

3        Petitioner claimed in the habeas petitions filed in the state superior, appellate and supreme

4  courts that his federal constitutional right to a fair trial was denied by the exclusion of this

5  evidence, which he contended also included evidence that Turley often left D. and the other

6  children unsupervised.  (Lodgment No. 15 at 3-4; Lodgment No. 13 at 4-7; Lodgment No. 11

7  at 3-4, 11-12.)  He argued in state court that this evidence would have contradicted the

8  prosecutor's opening statement that D. was sexually inexperienced, might have been used to

9  raise a reasonable doubt regarding whether D. had been infected with syphilis by Petitioner or

10 by another family member, and would have challenged Turley's credibility.  (Id.)  He also

11 contended he received ineffective assistance of trial counsel in connection to the admission of

12 this evidence, and of appellate counsel by the failure to raise this claim on appeal.  (Id.)

13       The superior court denied this claim, stating:

14       Regarding Petitioner's claim of prosecutorial misconduct, and to the extent
   his claim of ineffective assistance of counsel attempts to attack aspects of his
15 counsel's representation not raised on appeal, these arguments have been waived
   based on Petitioner's failure to raise them on appeal.  [¶]  Rulings of the trial court
16 on the admission or exclusion of evidence or other procedural matters may not be
   reviewed by way of habeas corpus.  (*In re Winchester* (1960) 53 Cal.2d 528, 532;
17 *see also Estelle v. McGuire* (1991) 502 U.S. 62, 67-68 ("(F)ederal habeas corpus
   relief does not lie for errors of state law.").)  Additionally, "the issue of
18 insufficiency of the evidence to support a conviction is not cognizable in and of
   itself in a habeas corpus proceeding. (See *In re Adams* (1975) 14 Cal.3d 629, 636;
19 *In re Lindley* (1947) 29 Cal.2d 709, 723."  *In re Spears* (1984) 157 Cal.App.3d
   1203, 1209-1210.)  Thus, Petitioner's contention the Court's exclusion of certain
20 evidence pertaining to the victim and the victim's mother, and that the evidence
   was insufficient to establish he had infected the victim with syphilis cannot be
21 considered through the instant petition.

22 (Lodgment No. 12, In re Dunn, No. HC 21321, Order at 2-3 (Cal.Sup.Ct. Aug. 23, 2010).)

23       The state appellate court thereafter denied the same claim stating:

24       In this petition, Dunn faults the trial court for excluding evidence that the
   victim's mother moved to San Diego because she was being investigated by
25 authorities in Atlanta about her sexual activities and the victim, and ruling that the
   mother would not be required to answer an important question asked by Dunn's
26 trial attorney.  Dunn also broadly argues his trial attorney's failure to investigate
   all information, establish a reasonable defense at trial, or challenge the
27 prosecution's case constituted ineffective assistance of counsel, and complains his
   appellate attorney never brought up the issue. The petition is procedurally barred
28 because the claims here could have been raised on appeal, and Dunn has not
   established his claims fall within any exception to the procedural bar. (*In re Reno*

1    (2012) 55 Cal.4th 428, 477-478.)  The claims are also unsupported, speculative
2    and conclusory, and fail to state a prima facie case for relief.  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

3    (Lodgment No. 14, In re Dunn, No. D064708, Order at 1 (Cal.App.Ct. Oct. 24, 2013).)

4         The state supreme court denied the petition raising the claim in an order which stated:

5         The petition for writ of habeas corpus is denied on the merits with regard
6    to petitioner's claim of ineffective assistance of counsel.  (See *Harrington v. Richter* (2011) 562 U.S. __ (131 S.Ct. 770, 785), citing *Ylst v. Nunnemaker* (1991) 501 U.S. 797, 803.)

7

8    (Lodgment No. 16, In re Dunn, No. S216039, Order at 1 (Cal. Apr. 23, 2014.).)

9         Because the state supreme court only explicitly addressed the ineffective assistance of
10   counsel claims raised in the state habeas petition (which this Court addresses in Claim 2 below),
11   citing page 803 of the Ylst opinion and page 785 of the Richter opinion, there has been no
12   rebuttal of the presumption that the state supreme court did not intend to lift the procedural bar
13   imposed by the lower state courts with respect to any claims other than ineffective assistance of
14   counsel.  Ylst, 501 U.S. at 803 ("Where there has been one reasoned state judgment rejecting
15   a federal claim, later unexplained orders upholding that judgment or rejecting the same claim
16   rest upon the same ground."); see also Richter, 131 S.Ct. at 785 ("The presumption may be
17   overcome when there is reason to think some other explanation for the state court's decision is
18   more likely."), citing Ylst, 501 U.S. at 803; see also Cannedy v. Adams, 706 F.3d 1148, 1159
19   (9th Cir. 2013) (holding that Richter did not change the Ylst look through doctrine).

20        Respondent contends this claim is procedurally defaulted in this Court because it was
21   denied on the basis of a state procedural rule requiring the claim to be raised on direct appeal,
22   which Respondent argues is independent of federal law and adequate to support the judgment.
23   (Ans. Mem. at 10-12.)  Respondent also contends Petitioner has not shown cause and prejudice,
24   or a fundamental miscarriage of justice, necessary to overcome the default.  (Id. at 12-13.)

25        When a state court rejects a federal claim based upon a violation of a state procedural rule
26   which is adequate to support the judgment and independent of federal law, a habeas petitioner
27   has procedurally defaulted his claim in federal court.  Coleman v. Thompson, 501 U.S. 722, 729-
28   30 (1991).  A state procedural rule is "independent" if it is not interwoven with federal law.

1   LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  A state procedural rule is "adequate"

2   if it is "clear, consistently applied, and well-established" at the time of the default.  Calderon v.

3   United States District Court, 96 F.3d 1126, 1129 (9th Cir. 1996).

4        Respondent bears the initial burden of pleading as an affirmative defense that Petitioner's

5   failure to satisfy a state procedural bar forecloses federal habeas review.  Bennett v. Mueller, 322

6   F.3d 573, 586 (9th Cir. 2003).  The Ninth Circuit has yet to determine whether California's rule

7   requiring a claim such as this one to be raised on direct appeal or not at all, is independent and

8   adequate.  However, a former Chief Judge of the Ninth Circuit and a Judge in this District have

9   found the rule to be comparable to California's timeliness rule, which has been determined to

10  be independent and adequate.  See Smith v. Crones, 2010 WL 1660240 (E.D. Cal. 2010)

11  (Kozinski, C.J., unpublished order denying habeas petition), citing Protsman v. Pliler, 318

12  F.Supp.2d 1004, 1007-08 (S.D. Cal. 2004) (finding rule to be adequate and independent).

13       Thus, Respondent has carried the initial burden of pleading the existence of an adequate

14  and independent state procedural bar, and the burden has shifted to Petitioner to challenge the

15  independence or adequacy of that procedural bar.  Bennett, 322 F.3d at 586.  Petitioner makes

16  no such effort, and the Court finds this claim to be procedurally defaulted.  Id.  The Court may

17  reach the merits of the claim if Petitioner can demonstrate cause for his failure to satisfy the state

18  procedural rule and prejudice arising from the default, or that a fundamental miscarriage of

19  justice would result from the Court not reaching the merits of the defaulted claim.[3]  Coleman,

20  501 U.S. at 750.

21  _____

22  [3] The Court notes that looking through the silent denial of this claim by the state supreme court
    to the appellate court opinion reveals that the claim was denied not only on the procedural ground of

23  failing to present the claim on appeal, but also with a citation to People v. Duvall, 9 Cal.4th 464, 474
    (1995), on the basis that it was unsupported, speculative, conclusory and failed to state a prima facie

24  claim for relief.  It is unclear whether the Duvall citation means the claim was not properly presented
    to the state court.  See e.g. Pombrio v. Hense, 631 F.Supp.2d 1247, 1251-52 (C.D. Cal. 2009)

25  (explaining that a citation to Duvall points to correctable defects and therefore renders such claims
    unexhausted in federal court).  Even to the extent this claim was not properly presented to the state

26  court, it is now technically exhausted and procedurally defaulted for the reasons discussed below with
    respect to those claims which have never been presented to the state court, and in any case it is clearly

27  without merit for the reasons set forth below as to why Petitioner cannot demonstrate prejudice to
    overcome the default.  See Acosta-Huerta v. Estelle, 7 F.3d 139, 142 (9th Cir. 1992) (holding that a

28  district court can deny a claim which has not been presented to the state court when the Court
    determines it does not present a colorable claim for relief).

**a) Cause**

The cause prong can be satisfied if Petitioner shows an "objective factor" that precluded him from raising his claim in state court, such as interference by state officials or constitutionally ineffective counsel. McCleskey v. Zant, 499 U.S. 467, 493-94 (1991). Petitioner contends here, as he did in state court, that he received ineffective assistance of counsel in connection to this claim. Because, as discussed below, the claim is without merit, the only reason apparent in the record for the failure to present this claim on direct appeal is a strategic choice by appellate counsel not to raise a weak claim. See Miller v. Keeney, 882 F.2d 1428, 1434 (9th Cir. 1989) (holding that appellate counsel has no constitutional obligation to raise every nonfrivolous issue on appeal because "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.")

As discussed immediately below in the prejudice section, Petitioner is unable to establish that a challenge to the exclusion of the evidence would have succeeded on appeal. Also, as discussed below in Claim 2, he has failed show that he received ineffective assistance of trial counsel in connection to this claim, or of appellate counsel regarding the failure to raise this claim on appeal. Thus, he is unable to rely on actions by his trial or appellate counsel to establish cause. See Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000) ("Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice. Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.") (citation omitted). The Court finds that Petitioner has not shown cause to excuse the default. McCleskey, 499 U.S. at 493-94; Edwards, 529 U.S. at 451-52; Keeney, 882 F.2d at 1434.

**b) Prejudice**

"Prejudice [to excuse a procedural default] is actual harm resulting from the alleged error." Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998). Petitioner cannot demonstrate

1  prejudice arising from the failure of this Court to reach the merits of this claim sufficient to

2  excuse the default because, for the following reasons, the claim is without merit.

3        Claims based on state evidentiary rulings are not cognizable in a federal habeas

4  proceeding unless the exclusion of the evidence was so prejudicial that it rendered a trial

5  fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 70-73 (1991); Ortiz-Sandoval v. Gomez,

6  81 F.3d 891, 897 (9th Cir. 1996); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991)

7  ("While adherence to state evidentiary rules suggests that the trial was conducted in a

8  procedurally fair manner, it is certainly possible to have a fair trial even when state standards are

9  violated; conversely, state procedural and evidentiary rules may countenance processes that do

10  not comport with fundamental fairness.")

11        Although Petitioner argues that "the case would have went in the Petitioner's favor" if

12  the jury had heard evidence that D. and her mother were under investigation by Atlanta

13  authorities and had evaded the investigation by moving back to San Diego, he does not indicate

14  why that would have made a difference. (Traverse at 2.) To the extent he contends it could have

15  been used to attack their credibility, or to argue to the jury that D. could have been infected with

16  syphilis through a sexual encounter in Atlanta, D.'s account of her sexual abuse by Petitioner

17  was consistent and corroborated. In addition, physical evidence was introduced in the form of

18  medical records that Petitioner had syphilis at the relevant time, and in the form of a syphilitic

19  lesion which formed at the point of contact at or near the inside of D.'s labia majora. Thus, the

20  excluded evidence would not have rebutted the strong evidence that Petitioner had sexual

21  intercourse with D. and infected her. In addition, the result of the Atlanta investigation was

22  inconclusive, which supports the appellate court's finding that this claim is speculative. It also

23  supports the trial court's finding that the investigation was not relevant, and that any relevance

24  would have been outweighed by the undue consumption of time required by presenting evidence

25  regarding the allegations, and by the possibility of misleading or confusing the jury.

26        Petitioner has failed to show that the exclusion of the evidence was so prejudicial that it

27  rendered his trial fundamentally unfair. McGuire, 502 U.S. at 70-73; Ortiz-Sandoval, 81 F.3d

28  at 897; Jammal, 926 F.2d at 919-20. Petitioner therefore cannot establish "actual harm" from

1  this Court's failure to reach the merits of the claim sufficient to excuse the default arising from

2  the failure to present the claim on direct appeal.  <u>Vickers</u>, 144 F.3d at 617.

3  **c) Fundamental miscarriage of justice**

4  Petitioner still can avoid the procedural default if he can demonstrate that a fundamental

5  miscarriage of justice would result from this Court's failure to reach the merits of the claim.  The

6  "miscarriage of justice" exception is limited to petitioners who can show that "a constitutional

7  violation has probably resulted in the conviction of one who is actually innocent."  <u>Schlup v.</u>

8  <u>Delo</u>, 513 U.S. 298, 327 (1995).  "In order to pass through <u>Schlup</u>'s gateway, and have an

9  otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light

10  of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no

11  reasonable juror would have found petitioner guilty beyond a reasonable doubt.'"  <u>Majoy v. Roe</u>,

12  296 F.3d 770, 775-76 (9th Cir. 2002), quoting <u>Schlup</u>, 513 U.S. at 327.  In applying this

13  standard, "A petitioner need not show that he is 'actually innocent' of the crime he was

14  convicted of committing; instead, he must show that '"a court cannot have confidence in the

15  outcome of the trial.'"  <u>Majoy</u>, 296 F.3d at 776, quoting <u>Carriger v. Stewart</u>, 132 F.3d 463, 478

16  (9th Cir. 1987) (en banc), quoting <u>Schlup</u>, 513 U.S. at 316.

17  Because the result of the investigation was inconclusive, it had little or no relevance.  In

18  addition, had the evidence been introduced, the jury would have heard D.'s statement that

19  Petitioner had done the same thing to her when she was four years old.  Petitioner has not shown

20  that, but for the exclusion of the evidence, it is more likely than not that no reasonable juror

21  would have found him guilty beyond a reasonable doubt, or that the Court cannot have

22  confidence in the outcome of the trial.  <u>Majoy</u>, 296 F.3d at 776; <u>Schlup</u>, 513 U.S. at 314-15.

23  **d) Conclusion**

24  Accordingly, the Court finds this second aspect of Claim 1 to be procedurally defaulted,

25  and that Petitioner has failed to demonstrate an entitlement to excuse the default.  Alternatively,

26  the Court finds that, even assuming Petitioner could excuse the default and the Court could reach

27  the merits of the claim, it is without merit, even under de novo review, for the reasons set forth

28  above regarding why Petitioner is unable to demonstrate prejudice to excuse the default.

1    In the next aspect of Claim 1 Petitioner alleges that: "The court prejudice [sic] against

2  appellant, because the [sic] denied appellant request [sic] of Marsden Motion."[4]  (Pet. at 6.)

3  Petitioner provides no further description of this claim or any allegations why the denial of his

4  Marsden motion was erroneous or prejudiced him in any way, and does not articulate the

5  substance of or the reason for the Marsden motion.  The record indicates that a pre-trial Marsden

6  hearing was reported and sealed.  (RT 4; CT 246.)  The record of the hearing is not transcribed,

7  apparently because Petitioner has never presented a claim related to the Marsden hearing to any

8  state court.  Because Petitioner has already had procedural bars imposed by the state courts, it

9  is clear he no longer has state court remedies available with respect to his Marsden claim, and

10  that it is therefore technically exhausted and procedurally defaulted in this Court.  See Cassett

11  v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his

12  federal claims in state court meets the *technical* requirements for exhaustion; there are no state

13  remedies any longer 'available' to him."); Coleman, 501 U.S. at 735 n.1 (holding that a

14  procedural default arises when "the court to which the petitioner would be required to present

15  his claims in order to meet the exhaustion requirement would now find the claims procedurally

16  barred."); see id. at 729-30 (a procedural default arises from a violation of a state procedural rule

17  which is independent of federal law, and which is clearly established and consistently applied.);

18  see Bennett, 322 F.3d at 581 ("We conclude that because the California untimeliness rule is not

19  interwoven with federal law, it is an independent state procedural ground."); see also Walker v.

20  Martin, 562 U.S. ___, 131 S.Ct. 1120, 1125-31 (2011) (holding that California's timeliness

21  requirement providing that a prisoner must seek habeas relief without "substantial delay" as

22  "measured from the time the petitioner or counsel knew, or should reasonably have known, of

23  the information offered in support of the claim and the legal basis for the claim," is clearly

24  established and consistently applied).

25  / / /

26  _____

27    [4]  Referring to People v. Marsden, 2 Cal.3d 118, 123 (1970) (holding that a criminal defendant represented by appointed counsel or the public defender may request that the court discharge the attorney and substitute new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney).

28

The standard of review applicable to claims which are technically exhausted and procedurally defaulted is unclear. Slovik v. Yates, 556 F.3d 747, 751 n.4 (9th Cir. 2009). The Marsden aspect of Claim 1 fails to present a basis for federal habeas relief under any standard of review, however, as it is entirely speculative and wholly conclusory. Speculative and conclusory allegations are insufficient to demonstrate entitlement to habeas relief. Blackledge v. Allison, 431 U.S. 63, 74 (1977); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).

The final aspect of Claim 1 is Petitioner's allegation of prosecutorial misconduct. (Pet. at 6.) He alleges the prosecutor falsely represented that Petitioner had made threats against Ava Loftis. (Id.) Petitioner presented this claim to the state courts in his sequential habeas petitions, and for the reasons discussed above with respect to the second aspect of Claim 1, the claim is procedurally defaulted. Petitioner cannot establish cause to excuse the default based on his trial counsel's failure to preserve an objection at trial or appellate counsel's failure to raise the claim on appeal for the same reason he cannot establish prejudice, because he has not identified any misconduct. According to the probation officer's report, two police reports indicated:

> On 10/12/07, Ava Lofis called the police from her place of employment to report an incident of domestic violence. She told the responding officers that, as she was talking with her ex husband in the parking lot at her place of employment, Mr. Dunn pulled up along side of her in a car. She was shocked to see him, because she had kicked him out of her house about two months prior (due to the crimes herein) and had not seen him since. She did not want to speak with him, so she walked away. Mr. Dunn parked, exited his car, approached her, and began "cussing and yelling at her." She believed he was going to hit her, because during the verbal assault, he had "puffed out his chest and clinched both his fists." He also told her he and or his sisters were going to "fuck her up." At some point the ex husband intervened, and the defendant left the area in his car.

> Ms. Loftis explained that she and the defendant had been in a relationship years earlier, and during that time, he had beaten her severely and caused serious injury. She said that both he and his sisters are capable of carrying out the threats.

> Later that same day, officers responded to a second report of a domestic violence situation involving Ms. Loftis. This time, the incident was occurring at her home. When the officers pulled up to the residence, they saw Mr. Dunn standing outside, yelling through the screened front door. He was detained and ultimately arrested for the threats he had made earlier in the day. In his statement, he admitted he had spoken with Ms. Loftis earlier in the day at her workplace, but he denied exiting his vehicle or threatening the woman in any way. No charges were filed regarding this incident.

(CT 190.)

When discussing scheduling of the witnesses prior to trial, the following exchange took place, which Petitioner alleges as a basis for his claim of prosecutorial misconduct:

> Def counsel: At the risk of complicating this even further, ah, [the prosecutor] made a remark that somehow Mr. Dunn had interfered with Miss Loftis coming to court. I'm not aware of anything like that. There were – after the alleged molests come to light, there was an incident reported by Miss Loftis that Mr. Dunn went to her place of work, caused a disturbance and based on that, the DA filed some charges of a criminal threat. Some other charges. When she came to the prelim, she testified consistently. as far as I could tell, about what happened. Ah, but her whole big thing was, "I wasn't scared. I wasn't intimidated." Words to that effect. I haven't read the transcript as to that lately because those charges haven't been going forward. So, you know, it wasn't that she testified – I don't think factually it was any different. I think the bottom line was she said she wasn't scared. Which is an element necessarily – necessary element of the criminal threat charge. And everybody realized in the courtroom, the judge and myself and [the prosecutor] realized, well, that count wasn't going anywhere. But I'm not aware of anything else that he could be referring to.

> Prosecutor: And, your Honor, I wasn't – I don't believe I stated that Mr. Dunn prevented Miss Loftis from coming to court. I stated that Miss Loftis moved back to Vegas from San Diego based, very likely, on some actions on Mr. Dunn's part, which was this criminal threat he made to her days after the incident.

> Petitioner: Bullshit.

> Prosecutor: That's neither here nor there. I'm simply saying that could be one of the reasons why they moved back to Las Vegas. Miss Loftis told the police on two different occasions that Mr. Dunn had threatened to kill her. That she had her ex-husband with her at one point of time because she was afraid of Mr. Dunn. Um, she came into court and testified that she was not afraid at that point in time and the counts were not bound over. Which, ah, is why we're not preceding on them at this point in time.

(RT 166-67.)

"To constitute a due process violation, the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" Greer v. Miller, 483 U.S. 756, 765 (1987), quoting United States v. Bagley, 473 U.S. 667, 676 (1985). The alleged misconduct must be reviewed in the context of the entire trial. Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).

Petitioner fails to allege how or why the prosecutor's comments, made at a pre-trial scheduling conference prior to jury selection, indicating that in his opinion Ava Loftis left San

Diego due to threats by Petitioner, constituted misconduct or impacted the fairness of his trial. Likewise, he alleged in his state habeas petition that the prosecutor committed misconduct by pre-trial argument to the trial judge regarding the admissibility of Petitioner's public health records regarding his history of contracting syphilis.  (Lodgment No. 15 at 55-93.)  In that instance, the prosecutor, in response to the trial judge's inquiry regarding the relevance of the records, stated: "Your Honor, it's not an element he knew he had syphilis.  However, there's something basically egregious about the fact that this man raped his eight-year-old daughter and infected her with syphilis.  The fact he knew he was infected with syphilis and continued to be infected with syphilis is something the jury should have the ability to hear."  (RT 81.)  That statement was made during pre-trial proceedings, as were the other comments by the prosecutor which Petitioner identified in state court as constituting misconduct.  (Lodgment No. 15 at 55-93.)  Although Petitioner argued in state court that the prosecutor, "crossed ethical boundaries in representing this case to the jury, presenting to the jury false inferences of facts, and evidence, and deliberately confused the jury with prosecutorial theories and opinion with cries of passion to the jury again and again during trial," there are no record citations to support such allegations, and they find no support in the record.  (Id. at 91.)  Because Petitioner has not identified any prosecutorial misconduct, the claim is without merit under any standard of review.

Accordingly, Petitioner has not shown cause or prejudice to excuse the default with respect to his prosecutorial misconduct claim, nor shown that the Court cannot have confidence in the verdict as a result of the alleged misconduct.  Alternatively, even assuming the Court could reach the merits of the claim, or that the citation to Duvall by the state appellate court indicates it was not properly presented to the state court, it does not provide a basis for habeas relief under any standard of review.  Acosta-Huerta, 7 F.3d at 142.

The Court finds that habeas relief is not available with respect to Claim 1 because the adjudication of the merits of the first aspect of the claim by the state court is neither contrary to, nor involves an unreasonable application of, clearly established federal law, is not based on an unreasonable determination of the facts, and because any error is harmless.  The Court finds that the remaining aspects of Claim 1 are procedurally defaulted and without merit.  The Court

1  therefore **RECOMMENDS** that habeas relief be **DENIED** as to Claim 1.

2  **C.    Claim 2**

3      Petitioner contends in Claim 2 that he was denied his right to the effective assistance of

4  counsel, as protected by the Sixth and Fourteenth Amendments, by his trial counsel's: (a) failure

5  to subpoena Dr. Ticson; (b) animosity toward Petitioner; (c) failure to preserve witnesses to

6  prove Petitioner's innocence; (d) failure to adequately investigate, prepare and present mental

7  health evidence in support of a diminished capacity defense; (e) conflict of interest; and

8  (f) failure to challenge the prosecutorial misconduct.  (Pet. at 7.)

9      Respondent answers that given the charges and evidence against Petitioner, his trial

10 counsel performed as well as any attorney could have, and the denial by the state appellate court

11 on the basis that Petitioner was not prejudiced by the failure to subpoena Dr. Ticson is neither

12 contrary to, nor involves an unreasonable application of, clearly established federal law, and is

13 not based on an unreasonable determination of the facts.  (Ans. Mem. at 8-9, 14.)

14     With respect to the first aspect of Claim 2, which was the only aspect of the claim raised

15 on direct appeal, the Court will look through the silent denial by the state supreme court to the

16 appellate court opinion, which stated:

17         Dunn also contends the judgment must be reversed because his trial
       counsel's failure to serve Ticson with a subpoena to attend the trial violated his
18       constitutional right to the effective assistance of counsel.  We disagree.

19         Under both the Sixth Amendment to the federal Constitution and article I,
       section 15 of the state Constitution, a criminal defendant has the right to the
20       effective assistance of counsel.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215
       (*Ledesma* ).)  [FN11]  To prevail on a claim of ineffective assistance of counsel,
21       a defendant must show that counsel's performance fell below an objective
       standard of reasonableness, and that there is a reasonable probability the result of
22       the trial would have been different had counsel's errors not occurred.  (*Strickland
       v. Washington* (1984) 466 U.S. 668, 687–688, 694 (*Strickland*); *People v.
23       Benavides* (2005) 35 Cal.4th 69, 92–93.)  Where, as here, "a defendant challenges
       a conviction, the question is whether there is a reasonable probability that, absent
24       the errors, the factfinder would have had a reasonable doubt respecting guilt."
       (*Strickland*, at p. 695; accord, *Ledesma*, at p. 218.)  "A reasonable probability is
25       a probability sufficient to undermine confidence in the outcome." (*Strickland*, at
       p. 694; accord, *Ledesma*, at p. 218.)

26
27         FN11: The federal Constitution provides: "In all criminal
       prosecutions, the accused shall enjoy the right . . . to have the
       assistance of counsel for his defence." (U.S. Const., 6th Amend.;
28       see *Gideon v. Wainwright* (1963) 372 U.S. 335, 342–343 (holding

6th Amend. right to counsel applies in state court criminal trials).)
The state Constitution similarly provides: "The defendant in a
criminal cause has the right . . . to have the assistance of counsel for
the defendant's defense. . . ." (Cal. Const., art. I, § 15.)

As we explained earlier (see pt. III.A.3., *ante*), we are confident the
absence of Ticson's testimony did not affect the outcome of Dunn's trial. The
evidence against Dunn was strong and largely undisputed. The testimony
expected from Ticson would merely have duplicated part of the testimony of the
People's expert and did not respond to the People's theory of guilt. Under these
circumstances, even if counsel were deficient in not serving Ticson with a
subpoena to appear at trial, it is not reasonably probable the jury would have had
a reasonable doubt about Dunn's guilt. He is, therefore, not entitled to reversal
based on ineffective assistance of counsel. (*Strickland, supra*, 466 U.S. at p. 692
("deficiencies in counsel's performance must be prejudicial to the defense in order
to constitute ineffective assistance under the Constitution"); accord, *Ledesma*,
*supra*, 43 Cal.3d at p. 217.)

Dunn, 205 Cal.App.4th at 1101.

As the state court recognized, for ineffective assistance of counsel to provide a basis for
habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's
performance was deficient. Strickland v. Washington, 466 U.S. 668, 687 (1984). "This requires
showing that counsel made errors so serious that counsel was not functioning as the 'counsel'
guaranteed the defendant by the Sixth Amendment." Id. Second, he must show counsel's
deficient performance prejudiced the defense, which requires showing that "counsel's errors
were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable." Id. To
show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the
proceeding would have been different absent the error. Id. at 694. A reasonable probability in
this context is "a probability sufficient to undermine confidence in the outcome." Id. Petitioner
must establish both deficient performance and prejudice in order to establish ineffective
assistance of counsel. Id. at 687.

"Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S.
356, 371 (2010). "The standards created by Strickland and section 2254(d) are both highly
deferential and when the two apply in tandem, review is 'doubly' so." Richter, 131 S.Ct. at 788
(citations omitted). These standards are "difficult to meet" and "demands that state court
decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388,
1398. Federal habeas functions as a "guard against extreme malfunctions in the state criminal

justice systems," and not simply as a means of error correction.  Richter, 131 S.Ct. at 786, quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979).  "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."  Strickland, 466 U.S. at 687.

Even assuming Petitioner could demonstrate that defense counsel was deficient in accepting Dr. Ticson's assurance that a subpoena was not required for her appearance, he has not established "a probability sufficient to undermine confidence in the outcome" arising from counsel's failure to subpoena her.  Strickland, 466 U.S. at 694.  As set forth above, Dr. Ticson agreed with Dr. Kaufhold that physical injuries are very seldom observed in children who report penetration, mostly due to their lack of sexual sophistication, that most men who sexually abuse children do not penetrate the vaginal canal, and that the history taken by the child remains the most accurate way to determine whether there was penetration into the one-inch area past the labia majora short of entering the vaginal canal.  Defense counsel indicated that Dr. Ticson was prepared to testify that Dr. Kaufhold was mistaken in concluding, based on D.'s statement that it hurt when she felt Petitioner inside her, that penetration into that one-inch area likely occurred.  However, neither defense counsel nor Petitioner has explained how Dr. Ticson would have dealt with D.'s consistent descriptions of the abuse as including pain when she felt Petitioner "inside" her private part, an account which was corroborated by the testimony of the three boys who were outside the bedroom door and heard her say: "Stop.  You're nasty.  I'm not Ava."  Even if Dr. Ticson could have convincingly opined that D.'s statements were based on her unsophisticated understanding of adult sexual intercourse, and that her account is equally or more consistent with no penetration, there is no indication that Dr. Ticson could have convincingly challenged Dr. Minka's testimony that she had to manipulate the labia majora to see the full extent of the syphilitic lesion, which the experts testified grew concentrically from the point of contact. Petitioner has not indicated how Dr. Ticson's opinion, if any, on the location of the lesion, which in any case would have been based on a review of Dr. Minka's report, would have carried much weight with the jury.  Nor has he shown that Dr. Ticson's testimony would have aided defense counsel's closing argument that Dr. Minka's findings were inconclusive, and that Dr. Kaufhold's

conclusion was entirely based on D.'s improbable account.

In light of the highly deferential and difficult to meet standards created by <u>Strickland</u>, the Court finds that the state court adjudication of this first aspect of Claim 2 on the basis that "even if counsel were deficient in not serving Ticson with a subpoena to appear at trial, it is not reasonably probable the jury would have had a reasonable doubt about [Petitioner]'s guilt" is not contrary to, and does not involve an unreasonable application of, the <u>Strickland</u> standard and is not based on an unreasonable determination of the facts. <u>Richter</u>, 131 S.Ct. at 788; <u>Pinholster</u>, 131 S.Ct. at 1398; <u>Strickland</u>, 466 U.S. at 694.

Petitioner next contends that counsel rendered ineffective assistance because he harbored animosity toward Petitioner. (Pet. at 7.) Petitioner alleged in his state court habeas petitions that, "counsel made no adequate defense, no zealous advocacy and no desire to obtain a favorable outcome for petitioner because lack of interest to obtain or fight adequately for petitioner," and, "defense counsel was personally prejudiced against his client and deliberately contributed to petitioner's conviction like a second prosecutor." (Lodgment No. 15 at 15, 22.) The state supreme court denied the petition in an order which stated: "The petition for writ of habeas corpus is denied on the merits with regard to petitioner's claim of ineffective assistance of counsel. (See *Harrington v. Richter* (2011) 562 U.S. __ (131 S.Ct. 770, 785), citing *Ylst v. Nunnemaker* (1991) 501 U.S. 797, 803.)" (Lodgment No. 16.) Because the state supreme court did not articulate the reasons for denying the ineffective assistance of counsel claims on their merits, this Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. <u>Richter</u>, 131 S.Ct. at 786.

Petitioner's allegation that defense counsel harbored animosity toward him is wholly conclusory. To the extent it relies on Petitioner's contention that trial counsel was deficient in accepting Dr. Ticson's assurance that she would appear without a subpoena, or counsel's failure to introduce evidence of the Atlanta welfare investigation, as set forth in detail above, it is inaccurate as defense counsel argued vigorously for introduction of the Atlanta investigation and

1  for a mistrial when Dr. Ticson became unavailable.  Defense counsel also vigorously argued to

2  the jury that the evidence of penetration was insufficient and inconclusive and even argued that

3  D.'s story that the abuse occurred was implausible and that someone other than Petitioner could

4  have infected her with syphilis.  Because the record shows no animosity toward Petitioner by

5  defense counsel, and Petitioner has identified no such animosity, the state supreme court could

6  reasonably have denied this claim on the basis that speculative and conclusory allegations are

7  insufficient to prove that counsel provided ineffective assistance.  Richter, 131 S.Ct. at 786;

8  Blackledge, 431 U.S. at 74; Borg, 24 F.3d at 26.

9      Petitioner next contends that trial counsel failed "to preserve witnesses to prove [his]

10 innocence."  (Pet. at 7.)  Petitioner does not indicate in the Petition which witnesses he is

11 referring to, and only stated in the state courts that, "if Petitioner would have had a investigator

12 he or she would have been able to secure favorable testimony on Petitioner's behalf, as the

13 investigator would have contacted witnesses that would have given good accounts for

14 Petitioner." (Lodgment No. 15 at 17.) He also alleged in state court that he, "had addresses and

15 e-mail of witnesses that were going to testify to Ava's jealousy and hate of [D.] always being

16 with her father or, he bought her ice cream and not all other kids." (Id. at 39.) Defense counsel

17 called a character witness to testify at trial that she had often seen Petitioner with children,

18 including her own and D., and there had never been an incident or complaint.  Petitioner's

19 allegations that the outcome of the case would have been different if other, unnamed witnesses

20 could have been contacted and called to testify regarding his character, or testify about Ava's

21 feelings toward D., are conclusory and speculative.  The state supreme court could have

22 reasonably denied this aspect of Claim 2 on the basis that speculative and conclusory allegations

23 are insufficient to prove that counsel provided ineffective assistance.  Richter, 131 S.Ct. at 786;

24 Blackledge, 431 U.S. at 74; Borg, 24 F.3d at 26.

25     Petitioner next contends trial counsel failed to adequately investigate, prepare and present

26 mental health evidence in support of a diminished capacity defense. (Pet. at 7.) This claim was

27 never presented to any state court and Petitioner does not provide any facts or argument to

28 support his bald allegation.  For the reasons set forth above regarding Petitioner's failure to

present the <u>Marsden</u> aspect of Claim 1 to any state court, this claim is also technically exhausted and procedurally defaulted due to Petitioner's failure to present it to any state court. However, the claim fails under any standard of review because it is wholly conclusory and completely unsupported by argument or evidence. <u>See</u> <u>Acosta-Huerta</u>, 7 F.3d at 142 (holding that a district court can deny a claim which has not been presented to the state court when the Court determines it does not present a colorable claim for relief).

Petitioner states "[d]efense counsel did not take steps to maintain petitioner's innocence. Because of conflited [sic] of interest counsel/client." (Pet. at 7.) Petitioner does not provide any further facts, explanation, or support for this statement. For the reasons set forth above, the record does not support Petitioner's allegation that defense counsel failed to adequately represent him. Moreover, this claim was not presented to any state court, and is wholly conclusory and completely unsupported by argument or evidence. The Court recommends denying relief as to this claim despite Petitioner's failure to present it to the state courts. <u>Acosta-Huerta</u>, 7 F.3d at 142.

Finally, Petitioner contends counsel failed to challenge the prosecutor's misconduct at trial or on appeal. (Pet. at 7.) As set forth above, Petitioner has identified no instances of prosecutorial misconduct. Even to the extent the prosecutor may have characterized Petitioner harshly or unfairly, it was done prior to a jury being selected, and there is no basis for finding that Petitioner was prejudiced by trial counsel's failure to object or by appellate counsel's failure to present such a claim on appeal. Thus, the state supreme court could have rejected this claim on the basis that Petitioner had failed to allege facts which, if true, established either deficient performance or prejudice by trial or appellate counsel. <u>Richter</u>, 131 S.Ct. at 788; <u>Pinholster</u>, 131 S.Ct. at 1398; <u>Strickland</u>, 466 U.S. at 694; <u>see also</u> <u>Featherstone v. Estelle</u>, 948 F.2d 1497, 1507 (9th Cir. 1991) (where "trial counsel's performance, although not error-free, did not fall below the <u>Strickland</u> standard[,] . . . petitioner was not prejudiced by appellate counsel's decision not to raise issues that had no merit."); <u>Baumann v. United States</u>, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance).

1    Accordingly, the Court finds that the state court adjudication of those aspects of Claim

2  2 which were adjudicated on the merits in state court is neither contrary to, nor involves an

3  unreasonable application of, clearly established federal law, and is not based on an unreasonable

4  determination of the facts.  The Court finds that those aspects of Claim 2 which were not

5  presented to the state court are procedurally defaulted and without merit.  The Court therefore

6  recommends habeas relief be **DENIED** as to Claim 2.[5]

7                                       **VI.**

8                         **CONCLUSION AND RECOMMENDATION**

9    For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court

10  issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing

11  that Judgment be entered denying the Petition and dismissing this action with prejudice.

12    **IT IS ORDERED** that no later than **April 3, 2015**, any party to this action may file

13  written objections with the Court and serve a copy on all parties.  The document should be

14  captioned "Objections to Report and Recommendation."

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22

23    [5] Petitioner attempts to raise a claim in the Traverse challenging the imposition of a restitution
24  fine imposed along with his sentence, alleging that the fine was imposed without a finding that he had
    the ability to pay. (Traverse at 4-5.) After the Traverse was filed, the California Supreme Court denied
25  a habeas petition in which that claim was raised, and Petitioner filed a new Petition in this Court raising
    that claim in So.Dist.Ca.Civil Case No. 15cv0093-H (WVG).  The Court dismissed that new Petition
26  because the Court lacks jurisdiction over a challenge to a restitution fine.  See Order filed March 10,
    2015 [ECF No. 4] in So.Dist.Ca.Civil Case No. 15cv0093-H (WVG), citing Bailey v. Hill, 599 F.3d
27  976, 982 (9th Cir. 2010) (§2254 "does not confer jurisdiction over a state prisoner's in-custody
    challenge to a restitution order imposed as part of a criminal sentence.")  To the extent the Court could
28  consider the restitution claim raised in the Traverse, the Court recommends denying habeas relief for
    the same reason the new Petition was dismissed, that the Court lacks jurisdiction over such a claim.

1    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

2    Court and served on all parties no later than **April 24, 2015.**  The parties are advised that failure

3    to file objections with the specified time may waive the right to raise those objections on appeal

4    of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>,

5    951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  March 11, 2015

BARBARA L. MAJOR
United States Magistrate Judge